**UNITED STATES of America ex rel. Armstrong JOHN, Petitioner,**

v.

**J. Leland CASSCLES, Superintendent, Great Meadow Correctional Facility, Respondent.**

No. 73-C-301.

United States District Court, E. D. New York.

May 3, 1973.

Robert T. Kasanof, Legal Aid Society for petitioner; by Mark Levine, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., for respondent; by Hillel Hoffman, Asst. Atty. Gen., of counsel.

ZAVATT, District Judge.

This is a petition by a prisoner in state custody for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.

The petitioner was tried to the court and a jury in Supreme Court, Kings County, New York from June 10 through June 19, 1968, and was found guilty of Manslaughter in the First Degree. On September 19, 1968, Judge Starkey, the trial judge, sentenced the petitioner to a term of imprisonment of 10 to 20 years.

The judgment of conviction was affirmed without opinion by the Appellate Division, Second Department, 35 A.D.2d 1081, 318 N.Y.S.2d 266 (1970). The Court of Appeals denied leave to appeal on February 4, 1971.

Petitioner moved for a new trial on the grounds of newly discovered evidence. This motion was denied on April 13, 1972. Petitioner then filed a habeas corpus petition in this court. Such petition was withdrawn in order to enable petitioner to exhaust his state remedies with respect to his motion for a new trial. Petitioner moved in the Appellate Division, Second Department for leave to appeal from the denial of his motion for a new trial. On February 14, 1973, the application for leave to appeal was denied. Thus, petitioner exhausted his state remedies with respect to his motion for a new trial. *See* New York CPL § 450.90(1); People v. Fein, 18 N.Y.2d 162, 272 N.Y.S.2d 753 (1966), cert. denied, 385 U.S. 649, 87 S.Ct. 766, 17 L.Ed.2d 668 (1967).

The court has examined the following from which it has gleaned the facts:

trial transcript ·(842 pages)

defendant-appellant's brief on appeal to the Appellate Division

respondent's brief on appeal to the Appellate Division

defendant-appellant's reply brief on appeal to the Appellate Division

petitioner's motion for a new trial

affidavit in opposition to motion for a new trial and accompanying memorandum of law

petition to this Court for a writ of habeas corpus, dated February 27, 1973 and accompanying memorandum of law

affidavit in opposition of Assistant Attorney General Hillel Hoffman, sworn to March 26, 1973

petitioner's reply memorandum of law dated April 10, 1973

On May 10, 1967, at approximately 9:00 P.M., an armed robbery was committed in the cleaning store of Louis Connor located at 287 Nostrand Avenue, Brooklyn, New York. During the commission of this robbery, Louis Connor was shot in the head, resulting in his death. There were no eyewitnesses to the crime.

Petitioner and Allen "Peewee" Durham were arrested for the offense on June 3, 1967, and subsequently indicted on October 24, 1967 in Indictment Number 2289/67 for the crime of Murder in the First Degree. Petitioner was also indicted for the crime of unlawful possession of a loaded revolver. Prior to trial Durham pled guilty to Murder in the Second Degree and the indictment was severed as to him.

Prior to trial, a *Wade* hearing was held to determine the admissibility of the identification of petitioner by one Marvis Johnson. Her testimony at this hearing was substantially similar to her testimony at trial and will be discussed *infra*. After the hearing, the court held that the identification was not tainted and was admissible at trial.

Marvis Johnson was the first witness called by the prosecution. She testified that on the evening of May 10, 1967, she had gone to the Clifton Bar, a bar located on the same side of the street as Mr. Connor's cleaning store and two stores away. She entered the bar while it was getting dark, had two bottles of beer and left when it was dark out. She had no idea of what time she entered the bar, how long she remained therein or what time she left. Although it was dark out, she did testify that there were some street lights. She started walking towards the cleaners. As she approached the store, she saw a boy standing outside of the store. She then heard a sound like a firecracker and another boy ran out of the cleaner's and bumped into her. At trial, she identified the second boy as petitioner, and previously had identified the first boy as Allen Durham. The boy who bumped into her had a gun in one hand and money in the other hand. She testified that she glanced at his face, glanced inside the cleaning store and ran home. She testified that the boy standing outside was short and that one of the boys was wearing a leather coat. Other than that, she was unable to describe anything about the two boys, their age, description or clothing. She further testified that she had never seen petitioner before this incident.

Johnson testified that she had been shot on June 2, 1967, by one Gregory Brown, a friend of petitioner. Prior to this shooting, she had also been to the Clifton Bar and had come home at 1:00 A.M. on June 2nd. After she came home, she testified that Brown came to her house and shot her. At the Wade hearing, Johnson testified that when Brown shot her he said: "that I [Johnson] had known who shot Mr. Connor. And he said, the same gun that shot Connor he had and he was shooting me." Although Brown was called as a prosecution witness, he was not questioned about the shooting. Nor was the above reason for the shooting introduced at trial. While she was awaiting a hearing with reference to this shooting, she saw petitioner and Durham in court. The court records indicate that petitioner's case and Brown's case were both on the July 6, 1967 calendar so that was the date she testified to when she next saw petitioner. Although she testified that

she saw petitioner that day, and even though at that time she was with a detective, Johnson did not tell anyone that she recognized the petitioner.

Sometime in 1967, two detectives came to Johnson's apartment asking for her. Upon answering the door, Johnson testified that she told the policemen that she was Marvis' sister and that Marvis was in Detroit.

On May 14, 1968, over one year after the killing, an assistant district attorney accompanied by four detectives went to Johnson's apartment, inquiring about petitioner's case. Why the investigation led them there was not revealed. At that time, and for the first time, she testified that she admitted having seen the holdup men. She was shown two photographs (mug shots), one of petitioner and one of Durham and asked if she could identify them. She was unable to recognize the two photographs as those of the perpetrators of the killing. Sometime thereafter and on the same day, she went down to the district attorney's office where she signed a statement to that effect. In that statement, she stated that she had three beers at the Clifton Bar and, as she stepped out of the bar, two boys ran past her and that she proceeded diagonally across the street (not passing the cleaner's).

Johnson then testified that two days later, on May 16, 1968, in order to ease her conscience, she called the assistant district attorney, came down to his office and gave a statement which was substantially similar to her present testimony at trial. On May 16, 1968, she was shown the same two photographs and identified them as those of the perpetrators of the killing. She further testified that her story of May 14th was a lie.

On cross-examination it was brought out that Johnson had been hospitalized in 1963 for sixteen days for habitual drunkenness and that she was presently on probation for unlawful entry.

Thus, although the robbery and killing occurred in May of 1967, and although

Johnson testified that she recognized the petitioner while in court on an unrelated matter in July of 1967, she did not come forth with an identification until May 16, 1968.

Ramona Lee, a friend of Gregory Brown and who was with Brown on June 3, 1967, the day he surrendered to the police in connection with the shooting of Johnson, testified at trial. She testified that, on the day Brown surrendered, petitioner told Brown that the police were looking for him and told Brown to give him the gun "Because that's the gun that me and Peewee [Durham] shot Connors with." Brown then gave a gun to petitioner and, at trial, Lee identified the gun. Lee also testified that she heard petitioner say that he knew who had shot Connor, but that he had not done it. She also heard Durham say that Sylvester Morgan was the killer, while she also heard Durham admit that he was the killer.

Gregory Brown testified that he shot Johnson with the same gun that was used to kill Connor; that petitioner had told him that the same gun had been used to kill Connor. Brown further testified that petitioner told him that he, Peewee and Crip (Sylvester Morgan) had killed Connor and that Peewee did the actual shooting. Brown also testified that Peewee told him he killed Connor, and he did not say that petitioner was with him. Brown also testified, however, that petitioner never told him that he killed Connor or that he was in any way involved with the robbery. Brown testified that he had received the gun used to shoot Johnson from Peewee and that the gun used to pass around a group of fellows like a "library card."

Raymond Kelly testified that petitioner told him that Durham killed the cleaner. He had asked petitioner if he was present at the time of the killing, and petitioner denied it. Petitioner never told him he was a party to the crime. However, Kelly did testify that petitioner told him "that him and Peewee and a third boy named Crip went to stick up the cleaners."

The petitioner took the stand in his own behalf and denied having been involved in the robbery and murder. Petitioner did admit that he had been in possession of the gun at various times, but that he never had the gun in his possession on or before May 10, 1967 and that for the first time on May 11, 1967 Sylvester Morgan gave him the gun. Petitioner then testified that that same evening (May 11) he gave the gun back. He subsequently got the gun again on June 2nd from Brown who had asked him to hold the gun. Petitioner then testified that he left the gun at a friend's house. Petitioner testified that, except for 5 to 10 minutes on the evening of May 10, 1967, he had been at Sylvia Gibbs apartment, a girlfriend, from 5:30 P.M. to 11:30 P.M. He did leave the house, located near the scene of the crime, for a 5 to 10 minute stretch of time at about 8:30 when he went across the street to a candy store and bought some soda and cake. Sylvia Gibbs testified and corroborated petitioner's story and further testified that she saw petitioner, from the window of her apartment, enter the candy store and that he was only gone for about 5 to 10 minutes.

Durham testified on petitioner's behalf. Prior to trial, and for about six months, Durham had stated that four persons were involved in the robbery including the petitioner. However, at trial, he testified that only he and a person named Connie were involved in the shooting and robbery; that petitioner was in no way involved. A search for Connie by the police proved futile.

After deliberating, the jury convicted the petitioner of manslaughter in the first degree. Upon hearing the verdict the judge remarked:

"Mr. Port [the defense attorney], this struck me as a compromise verdict, but pursuant to your request, I did charge the common law murder and the murder two and the man-slaughter one. They might have been a hung jury we had just gone to the jury on the question of whether there was a felony murder or not. I don't know. It's just a matter of observation, hindsight.

\* \* \* \* \* \*

As it was, I think that if we had gone to the jury on the felony murder or nothing, we might have had a disagreement. So here I think they compromised."

After petitioner's conviction and on June 21, 1968, petitioner pled guilty to unlawful possession of a loaded revolver. He was sentenced on September 19, 1968 to 3 and ½ to 7 years in prison on that charge, such sentence to run concurrently with the manslaughter sentence.

Petitioner had moved for a new trial on the grounds of newly discovered evidence. Such evidence consisted of: (1) a statement of Allen Durham that Sylvester Morgan was the only person with him when he committed the robbery-murder; (2) a statement of one Michael Phillips to the effect that, while he was a prisoner at Riker's Island Prison, he overheard Sylvester Morgan admit that he participated in the crime; and (3) a statement of Gregory Brown alleging that he was in Marvis Johnson's apartment on June 2, 1967, that she was a prostitute and he shot her because she robbed him.

In his petition, the petitioner claims that the showing to Johnson of only two photographs was so suggestive as to fatally taint her in-court identification, in violation of the Fourteenth Amendment and that the exhibition of the photographs to Johnson in the absence of defense counsel, after the petitioner had been imprisoned and indicted, was in violation of the Sixth and Fourteenth Amendments.

### Impermissible Identification

The test to be applied to determine whether the pretrial identification procedures employed here were in violation of petitioner's constitutional rights is:

"[E]ach case must be considered on its own facts, and that convictions based on eyewitness identification at

trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

The required inquiry is two-pronged; first, whether the identification procedure was impermissibly suggestive; and second, if so, whether under the totality of the circumstances it has such a tendency to give rise to a substantial likelihood of irreparable misidentification that to allow the witness to make an in-court identification would violate due process of law. *See,* United States ex rel. Phipps v. Follette, 428 F.2d 912 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970); United States ex rel. Bisordi v. LaVallee, 461 F.2d 1020 (2d Cir. 1972). The court is not concerned with the reliability of properly admitted identification testimony, but only whether the procedures leading to the identification were so defective as to make the identification constitutionally inadmissible. Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

■ The considerable body of recent cases on the subject matter of petitioner's first contention turn on the facts of the individual case. Significant factors in evaluating identification procedures are:

(1) The witness' opportunity to observe the defendant at the commission of the crime, considering the duration of the observation and the degree of attention. Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); United States ex rel. Beyer v. Mancusi, 436 F.2d 755 (2d Cir.), cert. denied, 403 U.S. 933, 91 S.Ct. 2263, 29 L.Ed.2d 712 (1971); United States ex rel. Anderson v. Mancusi, 413 F.2d 1012 (2d Cir. 1969); United States ex rel. Valentine

v. Zelker, 322 F.Supp. 440 (S.D.N.Y.), aff'd., 446 F.2d 857 (2d Cir. 1971).

(2) The description of the robbers immediately after the crime. Neil v. Biggers, *supra*; United States ex rel. Beyer v. Mancusi, *supra*; United States ex rel. Williams v. LaVallee, 415 F.2d 643 (2d Cir. 1969), cert. denied, 397 U.S. 997, 90 S.Ct. 1139, 25 L.Ed.2d 406 (1970); United States ex rel. Rutherford v. Deegan, 406 F.2d 217 (2d Cir.), cert. denied, 395 U.S. 983, 89 S.Ct. 2145, 23 L.Ed.2d 771 (1969).

(3) Initial certainty of identification. Neil v. Biggers, *supra*; United States ex rel. Geralds v. Deegan, 307 F.Supp. 56 (S.D.N.Y.1969).

(4) Lapse of time between the commission of the crime and the witness' pretrial identification. Neil v. Biggers, *supra*; United States ex rel. Anderson v. Mancusi, *supra*; United States ex rel. Williams v. LaVallee, *supra*; United States ex rel. Geralds v. Deegan, *supra*.

(5) Language used by the police in presenting the defendant for pretrial identification. United States ex rel. Geralds v. Deegan, *supra*.

(6) Extent of defense counsel's cross-examination. United States ex rel. Rutherford v. Deegan, *supra;* United States ex rel. Geralds v. Deegan, *supra*.

(7) The display of only one or two photographs to a witness. United States v. Simmons, *supra*; United States ex rel. Beyer v. Mancusi, *supra*.

■ The identification witness, Marvis Johnson, only had a glance at the perpetrator while it was dark out. The court in United States ex rel. Phipps v. Follette, 428 F.2d 912 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970), remarked that in observing a perpetrator of a crime, weight must be given to the motivation of the witness to make a careful observation. A bystander who knew a crime had been committed would have less of a desire to seek out and retain the image of the perpetrator than would the victim. Johnson, a bystander, only had a brief observation. She gave no description of

the robbers to the police, and at trial was unable to describe what they were wearing or their general features, except to testify that one of them was wearing a leather coat. Thus, the identification witness had little opportunity to observe the perpetrator of the crime.

The lapse of time between the commission of the crime and the pretrial identification is equally significant. The crime occurred on May 10, 1967, yet Johnson did not come forth with an identification until May 16, 1968, over one year after the commission of the crime. The longer the interval of time, the greater the danger that the initial observation would be dimmed and the subsequent photographic identification would play a more significant role. United States ex rel. Phipps v. Follette, *supra*. The accidental observation of petitioner by Johnson on July 6, 1967, while petitioner was before the court on the instant offense, could have played a significant role. There was a great likelihood that, upon viewing the photographs on May 14 and May 16, 1968, Johnson retained the image of her July 6, 1967 observation and not her observation at the time of the crime. Even though Johnson allegedly identified the petitioner on July 6th and even though she was then accompanied by a detective, she did not come forth with an identification.

Johnson initially denied being able to identify the petitioner on May 14, 1968.

Yet two days later she was positive in her identification. Although at trial the defense counsel vigorously cross-examined Johnson, nothing was elicited as to what language the police used in presenting the petitioner's photograph for pretrial identification on May 14, 1968. There was absolutely no excuse for showing Johnson only two photographs, one of each of the two defendants. This was not a case where there was an urgent need for prompt identification. The petitioner was already in jail and had been there for several months. A lineup could easily have been arranged or at least the police could have shown Johnson a greater array of photographs. Under the circumstances, the showing of the photographs to Johnson was the least desirable of any possible pretrial identification procedures.

Applying all of the above criteria, this Court concludes that the identification procedure was impermissibly suggestive and that under the totality of the circumstances it gave rise to a substantial likelihood of irreparable misidentification so that the in-court identification should have been excluded. Petitioner's right to due process of the law was violated, and his conviction must be and is set aside.

In view of my holding on petitioner's first contention, it is unnecessary to discuss petitioner's contention of the right to counsel at the pretrial photographic identification.[1]

1. Although a discussion of this point is not necessary in view of the holding on petitioner's first contention, a brief discussion of this issue is warranted. This Circuit has consistently held that a petitioner is not entitled to counsel at post-arrest and post-indictment photographic identifications. *See*, United States v. Counts, 471 F.2d 423 (2d Cir. 1973) ; United States v. Johnson, 467 F.2d 630 (2d Cir. 1972) ; United States ex rel. Johnson v. Department of Correctional Services, 461 F.2d 956 (2d Cir. 1972) ; United States v. Fernandez, 456 F.2d 638 (2d Cir. 1972) ; United States v. Mojica, 442 F.2d 920 (2d Cir. 1971) ; United States v. Fitzpatrick, 437 F.2d 19 (2d Cir. 1970) ; United States v. Bennett, 409 F.2d 888

(2d Cir. 1969), cert. denied, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 1011 (1970). I am aware that another circuit disagrees with the above view, United States v. Ash, 149 U.S.App.D.C. 1, 461 F.2d 92 (1972) (en banc), cert. granted, 407 U.S. 909, 92 S.Ct. 2436, 32 L.Ed.2d 682 (1972), argument held January 10, 1973, 41 U.S.L.W. 3385 (Jan. 16, 1973) ; however, the majority of circuits follow the Second Circuit. *See*, United States ex rel. Reed v. Anderson, 461 F.2d 739 (3d Cir. 1972) (en banc) ; United States v. Serio, 440 F.2d 827 (6th Cir.), cert. denied, 404 U.S. 838, 92 S.Ct. 129, 30 L.Ed.2d 71 (1971) ; United States v. Roustio, 435 F.2d 923 (9th Cir. 1970) ; United States v. Ballard, 423 F.2d 127 (5th Cir. 1970) ;

The court wishes to commend Mark Levine and colleagues for their able representation of petitioner.

The petition for a writ of habeas corpus is granted and the petitioner is ordered discharged from custody under the judgment of conviction unless the State of New York files a timely notice of appeal from this order or moves before the New York Supreme Court, Kings County, within thirty days from the filing of this memorandum-order, for a new trial of the charges against the petitioner stated in Indictment Number 2289/67.

This is an order.

United States v. Robinson, 406 F.2d 64 (7th Cir.), cert. denied, 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 243 (1969); McGee v. United States, 402 F.2d 434 (10th Cir. 1968), cert. denied, 394 U.S. 908, 89 S.Ct. 1020, 22 L.Ed.2d 220 (1969).

Resolution of inconsistent decisions among the several circuits will be resolved in the near future by a Supreme Court decision in United States v. Ash, *supra.* This Court feels confident that the position of the Second Circuit will be sustained.