**UNITED STATES of America ex rel. Armstrong JOHN, Appellee,**

v.

**J. Leland CASSCLES, Superintendent, Great Meadow Correctional Facility, Appellant.**

**No. 167, Docket 73–1892.**

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1973.

Decided Dec. 5, 1973.

21

Hillel Hoffman, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel

A. Hirshowitz, First Asst. Atty. Gen., on the brief), for appellant.

Mark L. Levine, New York City (Robert Kasanof, The Legal Aid Society, Barry S. Greene, Schuyler K. Henderson, New York City, on the brief), for appellee.

Before SMITH, MULLIGAN and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal is by the State of New York from the granting of a writ of habeas corpus to appellee on the basis of erroneous admission at trial of identification evidence.

On May 10, 1967, Louis Connor was slain during the robbery of his cleaning store. In June, 1968, appellee was tried for this crime and convicted of manslaughter in the first degree by the Supreme Court of Kings County. His conviction was affirmed without opinion, 35 A.D.2d 1081, 318 N.Y.S.2d 266 (1970), and the New York Court of Appeals denied leave to appeal on February 4, 1971. Thereafter appellee moved for a new trial on the basis of newly discovered evidence; the motion was denied on April 13, 1972. He then filed a habeas corpus petition in federal court, but the petition was withdrawn so as to enable him to exhaust his state remedies. His motion in the Appellate Division for leave to appeal from the denial of a new trial was itself denied on February 14, 1973, thereby exhausting his state remedies. *See* New York C.P.L. § 450.90(1); People v. Fein, 18 N.Y.2d 162, 169, 272 N.Y.S.2d 753, 757, 219 N.E.2d 274 (1966), cert. denied, 385 U.S. 649, 87 S. Ct. 766, 17 L.Ed.2d 668 (1967). Appellee then renewed his habeas petition before the United States District Court for the Eastern District of New York. There, without holding an evidentiary hearing, Judge Zavatt granted the petition, 358 F.Supp. 517. The State has taken this appeal.

Although there was other evidence linking appellee to the crime, one of the most important parts of the State's case was the testimony of Marvis Johnson. Mrs. Johnson testified that on the evening of the crime she had been walking home toward the cleaning store after visiting a bar. Standing in front of the cleaner's was a young man. As she reached the store, she heard a noise like a firecracker and then another young man with a gun in one hand and money in the other ran out of the store, bumping into her. After glancing at his face, Mrs. Johnson started running, as did the two young men. In court over a year later, Mrs. Johnson testified that appellee was the young man who ran out of the store with the gun and the money.

Mrs. Johnson, however, had not told anyone about the encounter on May 10, 1967, after it occurred, and until almost the trial of appellee. Rather, she apparently did not want to become involved, especially because she was herself on probation. Apparently no one, certainly not the police, knew that she was a witness, except, possibly the perpetrators. On June 2, 1967, three weeks after the Connor robbery and slaying, Mrs. Johnson was herself shot by Gregory Brown. At the hospital she told the police that as Brown was shooting her, he told her that he was shooting her because she knew who had shot Connor—someone had told Brown that she had seen them —and that he was shooting her with the same gun that killed Connor.[1] Sometime thereafter two detectives came to Mrs. Johnson's apartment to question her concerning the Connor killing. Again attempting to keep from being involved, now with the added knowledge, if her story as to the Brown shooting is to be believed, that her ability to identify the murderers had almost resulted in her own death, Mrs. Johnson told the detectives that she was Marvis Johnson's sister and did not know about the Connor

---

1. Brown denies this, in an affidavit four and a half years later, saying he shot her because she was a prostitute and drug dealer who while he was sleeping with her tried to steal his money, and that he did not know that it was the same gun that killed Connor.

killing and that Marvis Johnson had moved to Detroit.

On July 6, 1967, and this is the remarkable fact in this case, Mrs. Johnson was in court with reference to the case involving her own shooting by Gregory Brown. Apparently by pure coincidence appellee and his codefendant[2] were also in court that day; their case was then adjourned. Mrs. Johnson subsequently testified that she then recognized them as the young man who had been standing in front of the store and the young man who had come running out. Still she told no one.

Nothing else happened until May 14, 1968, a year and four days after the original crime. An Assistant District Attorney and four detectives came to Mrs. Johnson's apartment and showed her two "mug shots"—one of appellee and one of his codefendant. She told them that she could not identify them, but she came down to the Assistant District Attorney's office and signed a statement saying that she had seen the two perpetrators in court one day when she had been there in reference to her own case. Two days later, because, she says, her conscience bothered her, and perhaps because she feared that if she were caught in a lie she might get into further trouble, she called the Assistant District Attorney to tell him that she could identify the persons in the two pictures. She said that the two persons were the ones she had seen in court and also the ones she had seen at the scene of the killing.

At the suppression hearing prior to trial, the state court judge held that Mrs. Johnson's identification of appellee was not tainted in any way by the showing of only the two photographs and that Marvis Johnson was an honest witness whose previous untrue statements were occasioned by her not wanting to get involved. Her testimony, therefore, was admitted.

The question before this court on appeal is whether the showing of only two photographs to Mrs. Johnson was so suggestive as fatally to taint her in-court identification, violating appellee's fourteenth amendment rights.[3] The State argues strongly that LaVallee v. Delle Rose, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed. 637 (1973), calls for a reversal of the grant of habeas because it requires the district court to find by "convincing evidence" that the state court determination was erroneous, which the district court did not do here. Appellee argues equally strongly that *Delle Rose* is inapposite to this case, because the dispute here is over the historical facts, not over the law to be applied to them. *Cf.* United States ex rel. Williams v. LaVallee, 487 F.2d 1006 (2d Cir., 1973), slip op. 381, 390. It is clear to us that here there are mixed questions of law and fact, but because we feel that the district court incorrectly applied the law to the facts, we need not reach the question to what extent *Delle Rose* applies in this case.

The Supreme Court has held that due process is violated by an identification procedure only when it is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L.Ed.2d 1247 (1968). The district court properly stated that the required inquiry is two-pronged: first, whether the identification procedure was impermissibly suggestive; and, second, if so, whether under the totality of the circumstances it has such a tendency to

2. Appellee's codefendant in this case, "Pee-Wee" Durham, pleaded guilty prior to trial and testified as a prosecution witness.

3. Before the district court appellee also claimed that the showing of photographs to Mrs. Johnson without appellee's lawyer being present violated the sixth and fourteenth amendments. The district court, granting habeas on the basis of the photograph's taint, did not reach this question. We note that this claim is foreclosed by the Supreme Court's recent decision, United States v. Ash, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (U.S. June 21, 1973).

give rise to a substantial likelihood of irreparable misidentification that to allow the witness to make an in-court identification would violate due process. United States ex rel. Bisordi v. LaVallee, 461 F.2d 1020, 1023 (2d Cir. 1972); United States ex rel. Phipps v. Follette, 428 F.2d 912, 914–915 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970).

■ The showing of only two pictures, one of each suspect, to a possible witness and asking her if these are the two men she saw, or if she can identify these two men, is clearly impermissibly suggestive. See, e. g., United States ex rel. Gonzalez v. Zelker, 477 F.2d 797 (2d Cir. 1973). Nor were there any extenuating circumstances which might justify such prosecutorial conduct; here appellee and his codefendant had been incarcerated for approximately a year and had been indicted seven months earlier. Thus, the showing was not only suggestive, but was unnecessarily so. Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■ The next question then is whether showing these two pictures to Mrs. Johnson was likely to have led to a misidentification of appellee in court, for it is the likelihood of misidentification which violates the defendant's right to due process. Neil v. Biggers, 409 U.S. at 198, 93 S.Ct. 375. The court must seek to determine whether there was already such a definite image of the defendant in the witness's mind—before the suggestion arising from the unlawful identification procedure could take effect—that the in-court identification is reliable in spite of the suggestiveness of the unlawful identification procedure. In short, what is needed is evidence that

such a definite image existed. Normally the only evidence is circumstantial, and several cases give guidelines as to the factors which should be considered in weighing that circumstantial evidence. See, e. g., Neil v. Biggers, 409 U.S. at 199, 93 S.Ct. 375. These factors, however, are hardly exclusive, for as has been said, one must look to the totality of circumstances, United States ex rel. Cannon v. Montayne, 486 F.2d 263 (2d Cir., 1973), and each case must be considered on its own facts. Simmons v. United States, 390 U.S. at 384, 88 S.Ct. 967.

■ In all the testimony concerning Mrs. Johnson's identification of appellee, one fact stands out as clearly established —that on July 6, 1967, she saw appellee standing in court and that nearly a year later she remembered him well enough to identify a picture of him, albeit one suggestively proffered, as one of the men she saw in court. This must have surprised the prosecutors, because until she told them of her seeing appellee in court, they had not known that she had, and not knowing that, they could not have suggested to her in any way that the pictures were of persons she had seen in court. Thus her identification of appellee as one of the two men she saw in court was not tainted by the use of only the two photos. Her ability to identify appellee's picture as that of one of the men she saw in court almost a year before, and short of two months after the Connor shooting, establishes that she had a definite image of the petitioner in her mind.[4]

■ This, however, does not end our inquiry, for all we have established is that Mrs. Johnson had a clear and definite image of the man she had seen

4. We note that Mrs. Johnson has never been able to describe with any particularity the perpetrators or what they wore (other than that one wore a leather jacket), but it is not beyond our power of judicial notice to acknowledge that there is a "recognition" capability which may be different in degree and even separate in kind from the "recall" capability. This is somewhat analogous to the phenomenon that we all are aware of, that of not being able to recall a particular word to describe something, but of having no difficulty in recognizing and knowing the word upon seeing it. This is especially true where as here there is independent evidence of her ability to recognize appellee over the nearly one year between the fortuitous courtroom viewing and the photo viewing.

in court on July 6, 1967. But she testified on direct not as to this event but as to the events on the night of the crime, and her identification of appellee was that of the man who had run out of the store. To the prosecutors and later to the state court at the suppression hearing Mrs. Johnson said that on July 6, 1967, while awaiting her case, she saw the young man who had run out of the store on the night of the crime. If this be true, her identification of appellee from the photo as the young man she saw in court is tantamount to an identification of him as the young man she saw run from the store.[5] As to her recognition of appellee in court on July 6, 1967, however, we have no independent proof, because she told no one of it. We do, nevertheless, have the benefit of the trial judge's findings at the conclusion of the suppression hearing, and in matters of this kind we are bound to give considerable weight to the determination of the judge who saw and heard the witness. United States ex rel. Phipps v. Follette, 428 F.2d at 915. At the conclusion of the hearing the judge found that Mrs. Johnson was an "honest girl"—she was in fact 33 years old, however—and that she had recognized appellee in court on July 6, 1967. This finding, which is supported by the evidence, has some appeal to common sense in that it would be unlikely for one to remember for nearly a year a person she saw in court one day, unless that person had caught her eye in some significant way (absent proof of hearing what his case was all about and thereby connecting him to the crime she had witnessed). In light of these considerations then, we accept the state trial court's finding as to Mrs. Johnson's July 6, 1967, identification of appellee as the young man who ran from the store. This, together with her independently standing identification of appellee as the young man she recognized in court, is quite sufficient evidence that the unlawful identification procedure subsequently utilized by the prosecutors was not likely to result in a misidentification of appellee at trial.

In so holding, we do not ignore the factors to be considered which Neil v. Biggers, *supra*, outlines but rather we do not find them so helpful as the above analysis in this fact pattern. We believe the district court erred in its application of several of the factors. First, while considerable effort was made to discredit Mrs. Johnson's opportunities for observation, she testified and it was not disputed that there were street lights present which lighted the area sufficiently, that while her length of observation was short it was at very close range and she got a good look at the perpetrator's face, and that while only a bystander and not a victim of the crime, her hearing a sound like a firecracker and her physical contact with the perpetrator alerted her and involved her directly in the flight from the crime. Since the witness gave no description of the perpetrator immediately after the crime, the accuracy of any such description, Neil v. Biggers, 409 U.S. at 199, 93 S.Ct. 375, is not one of the factors to be considered here. The fact that she did not come forward, and indeed affirmatively avoided questioning, does not support a finding that she did not obtain a solid view of the perpetrator. Indeed, to the contrary, if she had not had a good look at the perpetrators and been able to identify them, she would have had no reason to fear. The district court interpreted Mrs. Johnson's attempts to avoid questioning and her initial untrue statement as to her inability to recognize appellee as indicative of uncertainty in her identification. This interpretation, however, is erroneous, for

---

5. While, of course, the witness did indeed tell the prosecutors that appellee was the young man who ran from the store, because of the necessary suggestion in the showing of only two photos that these persons were the perpetrators, we must find a basis for identification of appellee at trial as the perpetrator independent of any suggestion to that effect in the photos. *Cf.* United States v. Culotta, 413 F.2d 1343, 1347 (2d Cir. 1969), cert. denied, 396 U.S. 1019, 90 S.Ct. 586, 24 L.Ed.2d 510 (1970).

she never showed uncertainty in her identification; she showed only reluctance to make it. In fact, when she finally did make her identification, her certainty as to seeing appellee in court a year before was corroborated by the court records. The district court also was mistaken in its computation of the time between the commission of the crime and the witness's identification. As discussed above, she first recognized appellee when she saw him in court on July 6, less than two months after the crime, not the year considered by the district court. An important factor for consideration is the extent of cross-examination by defense counsel, so that all the facts concerning any possible misidentification are before the jury. United States ex rel. Rutherford v. Deegan, 406 F.2d 217 (2d Cir.), cert. denied, 395 U.S. 983, 89 S.Ct. 2145, 23 L.Ed.2d 771 (1969). The cross-examination of Mrs. Johnson was sufficiently extensive to cover more than 40 pages of transcript, and all the pertinent points were dealt with.

■ Our final consideration must be of the circumstances of Mrs. Johnson's July 6 view of appellee. If that view were itself suggestive, then there would definitely be a substantial likelihood of misidentification. In determining this, we must rely on the state court's suppression hearing testimony, which explored the area rather fully, and again we should give great weight to the court's findings there because of its ability to see and hear the witness. At the suppression hearing it was established that appellee's case was merely adjourned on the day Mrs. Johnson saw him in court. The judge concluded that there was no hearing held, and the defense attorney at the suppression hearing, who had been present in court also on July 6, did not object to that conclusion. Mrs. Johnson's perceptions likewise indicate no hint of suggestiveness in the setting. There was nothing inherently suggestive about the situation of two men before a judge, cf. United States v. Callahan, 439 F.2d 852, 862–866 (2d Cir.), cert. denied, 404 U.S. 826, 92 S.Ct. 56, 30 L.Ed.2d 54 (1971), nor was there any reason for Mrs. Johnson to suspect that the two young men would be present in court at all. She merely saw two young men standing before the judge and she recognized them as the two young men from the Connor killing. She says that she did not hear anything said that would have suggested that they were the perpetrators—she was not paying attention generally to what was happening in court. Nor did she hear anyone testify in court. Rather a detective took her outside for unrelated reasons. Upon this evidence, one purpose of which was to discover if this viewing were suggestive (Tr. 65), the judge found there was no taint. Such a finding is clearly supported by the evidence established, nor is there any evidence to the contrary.[6]

In light of all of the above, the state court's determination after full hearing that Mrs. Johnson's identification testimony was not tainted by the impermissible suggestiveness of the photographic identification procedures employed we find to be supported in the record, and we, therefore, reverse the judgment of the district court.

Judgment reversed.

---

6. Appellee claims that Mrs. Johnson had a longer period of time to see his codefendant, the young man who stood outside the store, and thus her identification of appellee was suggested by his standing in court on July 6, 1967, beside the young man she had seen longest. This, however, is speculation unsupported by anything in the record. Indeed, Mrs. Johnson may not have been paying much attention until she heard the shot and saw the other young man fleeing with a gun and money. Thus, her clear memory of appellee might have had just the opposite effect, suggesting to her that the man standing beside him, his codefendant, was the young man outside the store.