UNITED STATES of America ex rel. Jay GRAY, Petitioner,

v.

NEW YORK STATE BOARD OF PAROLE, Respondent.

No. 72 Civ. 3416.

United States District Court,
S. D. New York.

April 26, 1976.

Jay Gray, petitioner pro se.

Louis J. Lefkowitz, Atty. Gen. of N. Y., by Arlene R. Silverman, Asst. Atty. Gen., New York City, for respondent.

## MEMORANDUM OPINION

MOTLEY, District Judge.

In this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, Jay Gray raises several constitutional claims arising out of his arrest and conviction on a New York state criminal charge in 1971. Upon his plea of guilty in the Westchester County Court, petitioner was convicted of robbery in the first degree and was sentenced on September 9, 1971 to seven years imprisonment. Pursuant to § 710.70(2) of the New York Criminal Procedure Law, petitioner, who had previously requested a suppression of evidence hearing and an identification hearing in the Supreme Court prior to his plea, appealed the judgment of conviction, claiming that the trial court improperly denied his motions to suppress certain physical evidence and testimony relating to his identification by the robbery victim. He further argued that, as a result of the denials of these motions, his guilty plea was invalid. The conviction was affirmed by the Appellate Division, Second Department, on October 24, 1972, and application for leave to appeal to the New York Court of Appeals was denied by the Hon. Hugh Jones on May 28, 1974.[1]

Before considering the merits of petitioner's claims, two threshold matters require brief discussion. The instant action was commenced while petitioner was incarcerated at Great Meadow Correctional Facility in Comstock, New York, and accordingly, the warden of that facility was named as defendant. Subsequently, petitioner was transferred to the Attica Correctional Facility and, on October 17, 1975, was released on parole. Although the federal habeas corpus statute provides that relief is potentially available only to persons "in custody pursuant to the judgment of a State court",[2] it is now established that a person who is released from confinement to parole is "in custody" of the relevant parole board for purposes of this section.[3] Accordingly, in this action, the court has, on its own motion, substituted the New York State Board of Parole as respondent to facilitate resolution of the issues raised by petitioner.

A second important preliminary issue has been resolved by the United States Su-

---

1. Petitioner was represented by counsel both in the Supreme Court and in his appeal to the Appellate Division. His request for leave to appeal to the Court of Appeals, like his present action, was undertaken pro se.

2. 28 U.S.C. § 2254(b)

3. *Jones v. Cunningham*, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963). *See* § 212(6) of N.Y. Correction Law. The maximum expiration date of petitioner's sentence is January 4, 1978.

preme Court during the pendency of this action. In *Tollett v. Henderson*, 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973), the Court had announced the general rule that "[w]hen a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." Such a rule would preclude the petitioner in this case from raising his claims by way of the federal habeas corpus procedure.

However, in *Lefkowitz v. Newsome*, 420 U.S. 283, 95 S.Ct. 886, 43 L.Ed.2d 196, the Court announced an exception to the rule enunciated in *Tollett*: ". . . when state law permits a defendant to plead guilty without forfeiting his right to judicial review of specified constitutional issues, the defendant is not foreclosed from pursuing those constitutional claims in a federal habeas corpus proceeding." [4] As indicated *supra*, § 710.70(2) of the New York Criminal Procedure Law authorizes just such an appeal of rulings on suppression motions. Thus, the petitioner may now properly raise those previously mentioned claims which he raised in the New York appellate courts, despite his plea of guilty.

Although petitioner's constitutional claims are a bit difficult to discern from his papers, they appear to fall into the following categories: (1) illegal arrest; (2) improper seizure of property following arrest; (3) improper questioning following arrest; (4) improper identification procedures; (5) denial of counsel in the early stages of the investigation and prosecution; (6) improper bail terms; (7) ineffective assistance of counsel; (8) denial of the right to a speedy trial; (9) failure to provide free transcripts of various preliminary hearings. Of these various challenges, it appears from the transcripts of proceedings in the New York Supreme Court and the briefs submitted in

the Appellate Division by petitioner's assigned counsel that only the claims relating to the identification, the property seizure, and the arrest were raised in the New York courts. The other claims are, accordingly, dismissed without prejudice for failure to exhaust available state avenues of relief.[5]

Since the facts relative to the remaining claims were very adequately developed at suppression hearings in the Supreme Court on July 8, July 9, and July 28, 1971, and since petitioner has not challenged the sufficiency of the factual inquiry at those hearings, this court will rely on the facts as there set forth.[6] The facts will be briefly summarized as they relate to the contentions put forth in this court.

*The Seizure of the Tangible Evidence*

On the night of December 28, 1970, nineteen year old Michael Luiso was working as an attendant in his father's service station in Mount Vernon, New York. At approximately 7:00 P.M., two unmasked black men entered the station. One of them approached Luiso, placed a gun at his chest, and demanded money. After Luiso handed the gunman his wallet and a roll of paper money in his shirt pocket, he and his assailant stepped briefly into the lighted bay area of the station and the robbers then ran out the door. Mr. Luiso subsequently called the police. Testimony adduced at the July 8 and 9 hearings tended to indicate that both the exterior and the interior of the station were very well lighted, and that the robbers were in the station about five minutes.

Later that evening, at approximately 10:30 P.M., two uniformed members of the Bronx Task Force of the New York City Police Department stopped a white Cadillac automobile in the vicinity of 182nd Street and Southern Boulevard in the Bronx, apparently for a routine traffic check. The driver of the car was the petitioner in this action, Jay Gray, and there were three oth-

4. 420 U.S. at 293, 95 S.Ct. at 891–2, 43 L.Ed.2d at 204.

5. 28 U.S.C. § 2254(b)

6. 28 U.S.C. § 2254(c); *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

er passengers in the vehicle. According to the testimony of Patrolman William Watson, who briefly remained in the patrol car, his partner, Patrolman Daniel Boldi, advanced to check the driver's license and automobile registration.

Apparently as those documents were being examined, Officer Watson approached the Cadillac from the rear on the right side. He testified that, as he neared the car, a small brown envelope was ejected from the right front window and landed open on the ground in such a way that Bambu cigarette wrapping papers were sticking out (7/28/71 transcript [Tr.] p. 43). When he picked up the package and examined it, he discovered that it contained a substance which he believed to be marijuana. Having found this material, he informed the occupants of the car that they were under arrest and asked them to step out of the car. When they got out, they were frisked, handcuffed, and put into patrol cars which had arrived at the scene.

After the suspects were placed in the patrol cars, Officer Watson returned to the Cadillac and "gave it a superficial search of seats, floors and the glove compartment." (7/28 Tr. p. 21). While he had been standing near the open door on the right side of the vehicle, Watson had previously observed a wallet lying on the front seat partially under the right leg of the car's driver, petitioner Gray. He then placed the wallet in his pocket, and did not examine the contents until he arrived at police headquarters. Before driving the Cadillac to headquarters, Watson opened the car's glove compartment "[t]o see if there was any further contraband or weapons in the car" (7/28 Tr. p. 21), and there discovered a fully loaded Rohm .38 caliber revolver. At some point in the search, Watson also discovered

the sum of $197 either actually or constructively within the possession of petitioner.[7]

█ It is, apparently, the seizure of the money, wallet, and revolver which petitioner asserts as being violative of his right to be free from unreasonable searches and seizures. On the basis of the testimony adduced at the state suppression hearings, this court finds that there was no impropriety in acquisition of the money and wallet, and that any possible impropriety in the seizure of the revolver was not such as to warrant granting of the writ of habeas corpus in this case.

At the outset, the State conceded that, when the car was searched, the police officers had neither a search warrant for the car nor an arrest warrant for its passengers (7/28 Tr. p. 103). However, the officers were authorized to stop the car for a routine check of license and registration.[8] When the car had been stopped and Officer Watson observed the container of what appeared to be marijuana and cigarette papers, he clearly had probable cause to arrest the occupants of the car for the misdemeanor of criminal possession of a controlled substance in the seventh degree.[9] The state trial judge's conclusion to that effect was clearly correct (7/28 Tr. p. 145). Thus, both the arrest and any search properly incident to that arrest were justified by the facts at the officers' disposal.

Assuming, *arguendo*, that the police officers discovered the $197 during the course of frisking the petitioner incident to his arrest for possession of marijuana, as Officer Watson testified at one point (7/28 Tr. p. 25), such a search was clearly proper under the Supreme Court's decision in *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and the money

---

7. There was an inconsistency in Officer Watson's testimony as to whether this sum of money was discovered during the frisk of petitioner (7/28 Tr. p. 25) or whether it was discovered later during a search of the wallet at police headquarters. (7/28 Tr. pp. 97–101). In view of the state trial judge's finding that Officer Watson was, in spite of this inconsistency, a credible witness (7/28 Tr. p. 131) and in view of this court's ruling, *infra*, on the propriety of

the wallet's seizure, this court need not resolve this factual discrepancy.

8. Pursuant to § 401(4) of the N. Y. Vehicle and Traffic Law. *United States v. Thomas*, 289 F.Supp. 364 (S.D.N.Y.1968).

9. Section 220.03 of the N.Y. Penal Law. *See also* §§ 5.00 and 220.25 of the Penal Law.

thus obtained would be properly admissible at trial.

██ More critical to petitioner was the seizure of the wallet from the front seat of the automobile—whether or not the money was found therein—since this wallet contained identification belonging to Michael Luiso, the robbery victim, and was later identified by him (7/28 Tr. pp. 24–25). This court need not decide whether seizure of the wallet was justified as part of a search incident to the arrest of petitioner, because the wallet was clearly in plain view of Officer Watson, and petitioner could thus claim no justifiable expectation of privacy such as to warrant constitutional protection.[10] Officer Watson testified that he first observed the wallet lying on the seat as the passengers were exiting from the vehicle to be placed under arrest (7/28 Tr. pp. 20, 97–98), and seized it when all the car's occupants had been placed in the patrol cars. Under these circumstances, where discovery of the wallet was inadvertent and in the course of proper performance of a valid arrest, there was nothing constitutionally improper in the seizure.

Officer Watson's search of the car's glove compartment and consequent discovery of the revolver is more troublesome. By his own testimony, the car's occupants had already been handcuffed and placed in the waiting patrol cars when he conducted that search. The car was completely within his control, and he subsequently drove it to police headquarters, where it was impounded. There was clearly no urgency which would absolutely require a warrantless search, either to look for contraband or to ensure that the suspects would be denied access to weapons.[11] This court would differ with the state trial judge's determination that seizure of the revolver was justified as part of a search incident to the arrest of the petitioner.[12] However, this search and seizure arguably comes within that exception to the warrant requirement which applies under certain circumstances to automobile searches.[13]

██ Even assuming *arguendo* that the revolver was improperly seized, it by no means follows that the writ of habeas corpus should issue merely because one piece of evidence—albeit important evidence— was improperly seized by police officers and, presumably, considered among the factors leading to petitioner's plea of guilty to the robbery charge. It is clear, first of all, that an appellate court may hold that a federal constitutional error is harmless if it can declare a belief that it was harmless beyond a reasonable doubt.[14] That principle would seem equally applicable to a court considering an application for collateral relief.

██ Where, as in this case, the arguably tainted evidence was never presented to a jury; the petitioner was convicted upon his own plea of guilty; and there was ample, clearly admissible incriminating evidence (notably the wallet and the positive identification of petitioner by the robbery victim [discussed *infra*] from which either a judge or jury at trial might have inferred petitioner's guilt of the offense charged, this court concludes that any conceivable error in the state trial judge's decision denying the motion to suppress the revolver would not be constitutional error of such magnitude as to warrant upsetting petitioner's counseled, solemn admission of guilt in open court. Petitioner's plea of guilty was by no means entered solely in the face of illegally obtained evidence.

---

10. *See Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Lisznyai*, 470 F.2d 707 (2d Cir. 1972), *cert. den.* 410 U.S. 987, 93 S.Ct. 1516, 36 L.Ed.2d 184 (1973).

11. *Cf. United States v. Robinson, supra.*

12. The trial judge's legal conclusions are set forth at pp. 143–146 of the July 28, 1971 transcript.

13. *See Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

14. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), *reh. den.* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967).

## The Identification Procedure

Petitioner also questions the propriety of line-up and photographic identification procedures which were employed by the police on the night of his arrest. Construing his petition broadly in accordance with the argument raised by his attorney in the state courts, he alleges that the identification was so constitutionally defective as to taint any subsequent in-court identification of petitioner by the same witness.

The circumstances surrounding the identification were very adequately developed during two days of testimony and argument at a special hearing in the state court, at which both petitioner and Michael Luiso, the robbery victim, were extensively examined.[15] At the conclusion of that hearing, the state trial judge refused to suppress Mr. Luiso's in-court identification of petitioner, finding no taint due to the procedures followed on the night of the robbery. On the basis of the facts there adduced, this court finds no error in the trial judge's ruling, although this court arrives at the result by somewhat different reasoning.

The facts concerning the identification may be briefly summarized. At approximately 8:00 P.M. on the evening of the robbery, Mr. Luiso arrived at Mount Vernon police headquarters, where he spent about half an hour giving a statement to the police and examining a number of photographs in the police files. He was unable to identify any of the individuals in the mug shots as his assailant, and he later testified that he was not at that time shown a photograph of the petitioner (7/8 Tr. pp. 93–94).

Following his interrogation at Mount Vernon police headquarters, he went to his home, where he remained until approximately 11:30 P.M., when he was telephoned by Patrolman Watson. Watson informed him that his wallet had been found and asked that he come to police headquarters in the Bronx to view some men.[16] Luiso was then taken to the Bronx in a patrol car, accompanied by his father.

■ At the state identification hearing, there was considerable factual discrepancy between the testimony of Luiso and petitioner as to exactly what transpired at the line-up—whether petitioner was exhibited for some substantial period of time by himself, whether the witness exhibited any uncertainty concerning the identification, etc. Insofar as there was any dispute, this court is bound to follow the facts as found by the trial judge, absent any showing by petitioner of impropriety or inadequacy in the state fact-finding procedure.[17]

After Mr. Luiso arrived at the police station, he identified the seized wallet as his own, and indicated to the police that the seized pistol appeared similar to that which had been used in the robbery (7/8 Tr. p. 107). Apparently, he was not explicitly informed by the attending police officers that the wallet and revolver had been found with the men he was about to view (7/8 Tr. p. 111). At the request of the officers, Luiso looked through a peep-hole in a door and observed a line-up of four men—petitioner and the other three men who had been passengers in the Cadillac. All four of the men were black, but according to the testimony of petitioner at the state identification hearing, the other three men were very dissimilar in appearance to himself (7/9 Tr. pp. 177, 193). Apparently after a glimpse lasting only about a second, Luiso was able to identify petitioner as the man who had robbed him earlier in the evening (7/8 Tr. p. 113).

Subsequently, petitioner was directed by the police to remove the Army fatigue jacket which he had been wearing, and to put on a black leather jacket and a tam (similar to that worn by the robber), while none of the other men in the line-up were instruct-

---

**15.** The transcript of this hearing comprises 270 pages.

**16.** At the July 8–9 hearing, defense counsel strongly suggested that Watson told Luiso over the telephone that the men he was to view

were, in fact, those who had taken his wallet. However, Luiso denied that he had been so informed.

**17.** 28 U.S.C. § 2254(d). Petitioner has made no such showing here.

ed to don such apparel. Luiso again looked through the peep-hole and identified petitioner as the robber. Finally, although Luiso equivocated at length in his sworn testimony, he at last admitted that he had, later in the session, viewed petitioner alone in the line-up room while he was wearing the leather jacket and tam (7/8 Tr. p. 181). After completing the identification in the Bronx, Luiso was taken to a 2:00 A.M. meeting at Mount Vernon police headquarters, where he was shown photographs of the four men whom he had previously viewed and was asked whether he recognized any of them.

 The above skeletal recitation of facts comprises the circumstances on which petitioner's challenge to his identification must be based.[18] It is clear, in the first place, that, since the stationhouse line-up occurred prior to the commencement of adversary criminal proceedings, petitioner was not entitled to the presence of counsel as a matter of federal constitutional law.[19] Therefore, the identification of petitioner can be suppressed only if his right to due process of law was violated. In such a situation, ". . . the required inquiry is two pronged: first, whether the identification procedure was impermissibly suggestive; and, second, if so, whether under the totality of the circumstances it has such a tendency to give rise to a substantial likelihood of irreparable misidentification that to allow the witness to make an in-court identification would violate due process." [20]

 In this case, the court need not decide whether the line-up and the later display of photographs were "impermissibly suggestive" since the state trial court properly found, under all the circumstances, that the line-up would not taint Mr. Luiso's

definite in-court identification of petitioner as the robber (7/8 Tr. pp. 13, 260), and this court reaches the same conclusion with respect to the display of photographs. "The court must seek to determine whether there was already such a definite image of the defendant in the witness' mind—before the suggestion arising from the [allegedly] unlawful identification procedure could take effect—that the in-court identification is reliable in spite of the [alleged] suggestiveness of the unlawful identification procedure. In short, what is needed is evidence that such a definite image existed." [21]

The United States Supreme Court has indicated that ". . . the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." [22] Measured by these criteria, it appears to this court highly unlikely that any impropriety in the out of court identification procedures had any substantial deleterious effect on Mr. Luiso's later in-court identification of petitioner as the man who had robbed him hours earlier.

The state trial judge's findings that the witness had had an ample opportunity to view his assailant at the time of the crime (7/9 Tr. pp. 260–261), and that the witness was sufficiently certain of his identification, both at the line-up and at the hearing (7/9 Tr. pp. 260–262), were clearly supported by the evidence. Moreover, the line-up and subsequent photographic identifica-

18. To the extent that petitioner's application in this case raises factual claims considered and rejected by the state trial judge in his findings (7/9 Tr. pp. 260–266), this court necessarily rejects those claims. 28 U.S.C. § 2254(d).

19. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

20. *United States ex rel. John v. Casscles*, 489 F.2d 20, 23–4 (2d Cir. 1973), *cert. den.* 416 U.S.

959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974); *United States v. Tramunti, et al.*, 513 F.2d 1087, 1116 (2d Cir. 1975), *cert. den.*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50.

21. 489 F.2d at 24.

22. *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).

tion both took place within hours of the robbery.

Where, as here, the witness observed his unmasked assailant for as long as five minutes at very close range in a well-lighted garage during the commission of the crime, and subsequently identified him positively at a hearing at which he was thoroughly cross-examined "to bring the dangers of misidentification resulting from the [line-up and] photographic display to the court's attention,"[23] it appears highly unlikely that any impropriety in out of court identification procedures led to any inaccuracy in the witness' in-court identification of petitioner as the person who had robbed him. Accordingly, petitioner's constitutional right to due process of law was not offended by this procedure.

The petition for a writ of habeas corpus is denied.

---

**23.** *United States v. Yanishefsky*, 500 F.2d 1327, 1331 (2d Cir. 1974).