Eric J. HOLDEN, Appellant,

v.

STATE of Alaska, Appellee.

No. 3753.

Supreme Court of Alaska.

Nov. 9, 1979.

Terry C. Aglietti, Edgar Paul Boyko and Assoc., Anchorage, for appellant.

Susan Delbert, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

OPINION

Before RABINOWITZ, C. J., CONNOR and MATTHEWS, JJ., DIMOND, Senior Justice, and SCHULZ, Superior Court Judge.

DIMOND, Senior Justice.

It was a dark December night in the parking lot adjacent to Chilkoot Charlie's Saloon. A woman, whom we shall refer to as Jane Doe, was seated there in her car waiting for a friend to join her. She had just gotten off work at a Quik Stop grocery store. A man approached, opened the door of Jane's car, and asked for a cigarette. A little later he returned. He prevailed upon Jane to drive him to the end of Alley Way, on the basis that his friend was too drunk to drive. When they reached the end of Alley Way, the man pulled a gun from under his coat and assaulted Jane for the obvious purpose of committing rape.[1] She was able to escape after her assailant dropped his gun during their struggle. While Jane was running away, she heard her car start and drive off.

The man who had accosted Jane was later identified by her as the appellant, Eric Holden. He was indicted and tried for the crime of assault with intent to commit rape. A jury found him guilty of this offense and he was sentenced by the superior court to imprisonment for 15 years. Holden has appealed the conviction on several grounds, and also the sentence as being excessive.

## I. ASSAULT WITH ATTEMPT TO RAPE VS. ATTEMPTED RAPE

Holden contends that he was deprived of equal protection of the laws and due process of law when he was charged with the crime of assault with the intent to commit rape, which carries a maximum prison term of 15 years, rather than being charged with the crime of attempted rape, which, he contends, calls for a maximum prison term of 10 years.[2] We have never held that statutes which allow differing punishments for the same criminal conduct are necessarily unconstitutional as giving prosecuting officials unwarranted charging discretion. However, we have recognized that a substantial question is thereby presented. *Bell v. State*, 598 P.2d 908

---

1. The man told Jane to move her seat back, recline it, and take off her clothes.

2. Holden's argument is that there is such a crime as attempted rape, which is defined by the interrelationship of AS 11.15.120, AS 11.-15.130 and AS 11.05.020.

AS 11.15.120(a) defines the substantive crime of rape:

> *Rape.* (a) A person who (1) has carnal knowledge of another person, forcibly and against the will of the other person, or (2) being 16 years of age or older, carnally knows and abuses a person under 16 years of age, is guilty of rape.

AS 11.15.130(c) provides, in pertinent part, that a person convicted of rape may be imprisoned for not more than 20 years nor less than one year.

Finally, AS 11.05.020 specifies the punishment which may be imposed for the attempt to commit a crime:

> *Punishment for attempt.* A person who attempts to commit a crime, and in the at- tempt does any act toward the commission of the crime, but fails, or is prevented or intercepted in the perpetration of the crime, when no other provision is made by law for the punishment of the attempt, upon conviction, is punishable as follows.
>
> (1) If the crime attempted is punishable by imprisonment in the penitentiary or state jail, the punishment for the attempt is by the same imprisonment, as the case may be, for a term not more than half the longest period prescribed as a punishment for the crime. If the period prescribed as a punishment for the crime is an indeterminate or life term, the punishment for the attempt shall be fixed by the court at a term not more than 10 years.
>
> (2) If the crime attempted is punishable by a fine, the punishment for the attempt shall be by a fine of not more than half the amount of the largest fine prescribed as a punishment for the crime.

(Alaska 1979); *State v. Erickson*, 574 P.2d 1, 18 n.12 (Alaska 1978). This case is not an appropriate one for resolution of this issue.

Either attempted rape and assault with intent to commit rape are separate crimes, or they are not. If they are separate, that must mean that there may be an attempted rape without an assault, and thus there is an added element which must be proven to make out the crime of assault with attempt to rape under AS 11.15.160. On the other hand, if the crimes are not separate then "other provision is made by law for the punishment of the attempt," AS 11.05.020, *supra* note 2, and thus the punishment provisions of AS 11.05.020 do not apply.[3] In neither case is there any arguably impermissible charging discretion.[4] Holden was properly charged with assault with intent to commit rape under AS 11.15.160.

## II. THE IDENTIFICATION OF HOLDEN

Shortly after the assault, Jane was taken to the Anchorage police station. While she was being interviewed by Officer Winkelmann, a man subsequently identified as Michael Bennett was brought into the adjacent office. The two offices were separated by a partition opaque to the waist, with glass filling in the remaining space to the ceiling. Acting on a "hunch" about "night people," Winkelmann asked Jane if this man was her attacker. She said that he was not, but that he was the man who had been with her assailant in Chilkoot Charlie's parking lot.

Bennett had been arrested that evening for operating a vehicle while intoxicated. He was operating Holden's blue Dodge sedan, within a few blocks of the place where Jane testified the attack occurred. Following Bennett's arrest, the car was towed to the police station. Winkelmann left Jane and talked to Bennett and the officer who arrested him. Bennett gave the name of Holden as his companion that night. Winkelmann then ran a license check of the vehicle in which Bennett had been arrested, which revealed that Holden was the registered owner.

Winkelmann then asked registration and records personnel at the police station to run a registration and name check on Eric Holden. While waiting for the results of this check, he took Jane downstairs and showed her a large board with pictures of some 50 suspected burglars. Jane looked at the pictures for about five minutes and saw some high school acquaintances, but did not see her assailant. Winkelmann then took her back upstairs. Winkelmann left the office and returned with two "mug shots" of Eric Holden, one taken in 1973 and one in 1976. He said he had a "wild hunch," that he was taking a "wild chance," and handed the pictures to Jane. She looked at the photographs and identified Holden as the man who had attacked her.

Holden claims that Jane's identification of his photograph at the police station was improperly suggestive, because she was shown a photograph of him alone and because the photographs were "mug shots." He contends, therefore, that evidence of this identification, together with its fruits, *i. e.*, her in-court identification of him, ought to have been excluded.

The basic reason for excluding such identification would be the likelihood or possibility that the suggestive procedure could give rise to a substantial likelihood of irreparable misidentification and thus deprive an accused of due process of law.[5] Because of that likelihood, we join with other courts in expressing our disapproval of such practices. As the Supreme Court of Delaware has stated:

The showing of a single photograph of a suspect . . . ha[s] been widely condemned as improper police practice.

3. *Delaney v. Gladden*, 397 F.2d 17, 19 (9th Cir. 1968); *Turnbough v. Wyrick*, 420 F.Supp. 588, 592 (E.D.Miss.1976).

4. *See Bell v. State*, 598 P.2d 908, 913 (Alaska 1979); and authorities cited in note 3 *supra*.

5. *Manson v. Brathwaite*, 432 U.S. 98, 107, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140, 149 (1977).

*Stovall v. Denno,* [388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)]; *Simmons v. United States,* [390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)] . . . . We take this occasion to reemphasize that condemnation. However, whether such confrontations violate due process depends on the "totality of the surrounding circumstances." *Stovall v. Denno, supra; Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) . . . .[6]

▮ Although the identification of one who becomes an accused by means of a single photograph is improper, it will not in itself always lead to a reversal of a conviction. In determining the admissibility of identification testimony, the test is whether such identification is reliable, as weighed against the corrupting effect of the suggestive identification itself. The United States Supreme Court has stated that the factors to be considered include

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.[7]

We analyze these factors as follows:

## A. *The Opportunity to View*

Jane had several opportunities to view her assailant. He opened her car door twice, which allowed her to see his face in the interior light. She watched him walk back to his car which was parked immediately next to hers. She testified at the omnibus hearing that the light in the parking lot was sufficient so that she could see him without difficulty. She further testified that she was sure that there was enough light from the houses near the alley so she could see what her assailant looked like. The entire incident consumed between fifteen minutes and half an hour. While the lighting was not overabundant, it appears to have been adequate, and the victim seems to have had an adequate opportunity to view her assailant.

## B. *The Degree of Attention*

Although Jane was no police officer, as was the witness in *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), neither was she "a casual or passing observer, as is so often the case with eyewitness identification." *Manson,* 432 U.S. at 115, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. Rather, she was a victim. The measure of her attentiveness overlaps somewhat with that of her opportunity to see her attacker, the accuracy of her prior description of him, and the certainty of her identification of his photograph. She was with him for approximately fifteen to thirty minutes. She saw his face when he asked for a cigarette. She looked at him when he gave her directions while she was driving the car. She also looked face-to-face at him when he pulled the gun. We believe her attention is a positive factor in assessing the overall reliability of her identification.

## C. *The Accuracy of the Description*

The description that Jane gave of Holden was that of a white male, twenty-five years old, with light brown hair approximately shoulder length, a beard and a moustache, who spoke with a normal voice, may have been drunk, and may have been wearing a down jacket. While the description she gave was fairly general, no one has suggested that it was inaccurate. As one court recognized:

> We note that Mrs. Johnson has never been able to describe with any particularity the perpetrators or what they wore (other than that one wore a leather jacket), but it is not beyond our power of judicial notice to acknowledge that there is a "recognition" capability which may be different in degree and even separate in kind from the "recall" capability.

*United States ex rel. John v. Casscles,* 489 F.2d 20, 24 n.4 (2d Cir. 1973). While Jane's description may have fit more than one individual, it did fit Holden.

---

6. *Brown v. State,* 329 A.2d 153, 155 (Del.1974).

7. *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977).

### D. *The Level of Certainty*

Jane testified at the omnibus hearing that she "was positive" when she saw the photograph that the man depicted was her assailant. Officer Winklemann specified at that hearing that her identification was without hesitation or doubt. Holden tries to make an issue of the fact that Jane became emotional when she saw Bennett, Holden's companion, at the police station, but did not similarly react when she saw Holden's photographs. However, as the Arkansas Supreme Court explained in *McClain v. State*, 247 Ark. 33, 444 S.W.2d 99, 103, 39 A.L.R.3d 992, 998 (1969):

> Whether [she] started crying, or nearly went into hysterics, is not really the important point; [both the police officer and the victim] agreed . . . that the identification was positive, and expressed without the slightest hesitation or equivocation . . . .

### E. *The Time Between the Crime and the Confrontation*

Jane was at the police station for no more than one and one-half hours. She left there in no more than two hours after she first laid eyes on her assailant. Even Holden concedes that "this factor of reliability favors the state's case."

Against the foregoing factors, the corruptive influence of the suggestive identification must be weighed. Officer Winkelmann showed Jane two photos of Eric Holden and said, roughly, "I have a wild hunch." The phrase may seem more suggestive to some than it does to others. There are two factors indicating that the suggestion inherent in single subject displays was minimal in this case. First, the photos of Holden were given to Jane after she had already viewed some fifty similar photographs in the police station, without identifying any of them as her assailant. Second, Winkelmann testified that he asked Jane if Bennett were her assailant before he showed her Holden's pictures, and she responded, "No, it was not the man, but it was the man that was with him . . . ."

There was some similarity between her descriptions of the two men, the major difference being hair color. If there had been any real probability of misidentification occasioned by one-man showups, it is reasonable to assume that she would have identified Bennett as her assailant. The particular photographs of Holden were mug shots, but Jane testified twice that she did not notice the name or other information on the pictures.

In light of the totality of the circumstances, it appears that the indicia of reliability are not overborne by the suggestive influence of the improper procedure. The testimony relating both to the original identification and the later in-court identification were properly admitted.

■ At the trial, Jane identified her assailant from the pictures, or mug shots, of Holden that she had seen before. She was then asked by the prosecuting attorney in direct examination if she saw Holden in the courtroom. She said that she did not. Later, on redirect examination by the state, Jane identified Holden in the courtroom. Holden moved to strike her testimony regarding this identification, and the court denied the motion. Holden asserts this ruling as error.

There is no error here. The record reveals that almost immediately after Jane had stated that she did not see her assailant in the courtroom, she realized that she had made a mistake and that he was seated at counsel table in the courtroom. What had caused her original uncertainty was the fact that Holden had had a beard and long hair when he assaulted her, and at the trial his hair was cut and his beard shaved off. It is clear from Jane's later testimony that she clearly identified Holden as her assailant.

■ It is suggested by Holden that Jane's identification may have been influenced by a conversation that she had with the assistant district attorney during the recess which immediately followed her direct examination by the state, which related to her initial failure to identify Holden. The inference that Holden tries to raise—

that the assistant district attorney may have had something to do with Jane's later, positive identification of Holden—will not hold up. Following cross-examination by the defense, the prosecuting attorney asked Jane:

Now, based on any conversations that you may have had in the hall, whether it be with me or with . . . anyone else, did that in any way influence your opinion as to who your assailant was?

Jane's answer was: "No, I knew when I was on the stand, I just didn't know what to do." Furthermore, defense counsel rejected any suggestion that the assistant district attorney prosecuting the case had influenced Jane's subsequent identification.

### III. THE SEARCH WARRANT

At the police station, Jane identified Michael Bennett as the man who had been with her assailant on the night of the assault. Bennett had been arrested that evening for the offense of operating a motor vehicle while intoxicated when the police found him sitting in the driver's seat of a blue Dodge sedan within a few blocks of the place where Jane had been attacked. Following Bennett's arrest, the car was towed to the police station, and a license check revealed that Holden was the registered owner of the car.

The next day the police obtained a warrant to search Holden's automobile, and seized a blue down jacket and a cartridge clip for a Walther P–.38 handgun. Before trial, Holden moved to suppress these items, alleging the warrant to be invalid. The motion was denied, and the state introduced evidence of the clip and the jacket at the trial.

■ Holden claims that the items seized from his car pursuant to a search warrant ought to have been suppressed because the search warrant was based on misrepresentations made by Officer Sherbahn. His claim is wholly without merit, for Officer Sherbahn made no such misrepresentations.

On the night of the incident, Officer Winklemann showed Jane the defendant's car, which had been impounded in the police garage when Bennett was brought in for OMVI. She positively identified that car as the specific car from which her assailant had come. Thus, when Officer Sherbahn testified the next day at the warrant hearing that Jane had identified the car as a "blue Dodge sedan," he made no misrepresentation. The reason is that whether or not she used the word "Dodge," she had identified the car as the blue Dodge sedan she saw in the police garage.

Holden also claims that Officer Sherbahn made a misrepresentation when he testified at the warrant hearing that Jane had told him she was "certain" that her assailant had been wearing a blue down jacket. At the suppression hearing, Jane testified only that she "thought" the jacket was blue. This is a minor inconsistency, and cannot be characterized as a misrepresentation by Officer Sherbahn such as to affect the validity of the warrant.

■ Considering all of Officer Sherbahn's testimony in support of the issuance of a search warrant, the court had before it the following: (1) Jane's identification of Holden as her assailant, (2) her identification of Bennett as a companion of her assailant, (3) her statements as to the appellant's presence in the car at Chilkoot Charlie's parking lot the evening of the assault, (4) her description of the car as an old blue dented sedan, (5) the record identification of the car as belonging to Holden, and (6) Jane's statement that her attacker was wearing a down jacket. This information was ample to allow a judge to conclude that a car registered to Holden in which he had been seen before the assault, and which contained a down jacket, would probably contain evidence of the crime. The search warrant was validly issued.[8]

### IV. THE SENTENCE APPEAL

The trial judge sentenced Holden to fifteen years' imprisonment, the maximum

---

8. In light of the fact that the judge had probable cause to issue the search warrant based on Officer Sherbahn's testimony, there is no need to consider Holden's contention that the warrant was defective because based on the unreliable hearsay testimony of Michael Bennett.

sentence provided by statute for the crime of assault with intent to commit rape. Holden contends that this sentence is excessive.

Forcible rape ranks among the most serious crimes.[9] Although somewhat less serious than rape itself, an assault with intent to commit rape, particularly where a dangerous weapon such as a gun is used, is also a serious crime.[10] An attempt by a man to have carnal knowledge of a woman is an assault upon her dignity and integrity as a human being, and cannot be countenanced by society.

Holden's past record is not unblemished. At age fourteen, he was adjudicated a delinquent as a juvenile in California and spent some two and one-half years in a juvenile detention institution. In 1968, he had a battery conviction in California and was fined. In the same year, he was convicted of possession of marijuana and spent seventy-four days in jail with three years' probation. In 1974, he was convicted in Alaska of carrying a concealed weapon and was fined, with ten days in jail suspended. He has had a serious problem with alcohol.

■ More serious, however, is the evidence of his having raped a woman in 1976. At the sentencing hearing, the prosecution called a woman who testified that Holden had raped her on July 30, 1976. She testified that he offered her a ride home from Chilkoot Charlie's saloon, and that he took her to a party where they drank beer and consumed cocaine, then took her to the Anchorage International Airport where he raped her. The state had declined prosecution of her case because of insufficient evidence and because of inconsistencies between her two statements given to the police.[11]

In prior decisions, we have held that a maximum prison sentence generally should not be imposed "without some foundation for characterizing a defendant as the worst type of offender."[12] We have stated:

> Some of the factors which this court has looked to in order to support such a characterization—and the imposition of a maximum term—have been prior criminal convictions, age, military records, employment history, drug or alcohol addiction, presentence report evaluations and recommendations, and behavior which has been considered to demonstrate an antisocial nature or dangerous propensities which pose a clear risk to the public.

*State v. Wortham,* 537 P.2d 1117, 1120 (Alaska 1975).

The sentencing judge found Holden to be the worst type of offender. He based this finding primarily on the fact that Holden's propensities to engage in criminal conduct stemmed from his abuse or excessive use of alcohol, and because his psychological make-up, as reported by doctors, experts in the field of psychology and psychiatry, indicates that Holden is a very dangerous person.

In the exercise of our jurisdiction to review sentences, we have examined the record in this case, with particular emphasis on the nature of the crime that Holden committed, his character so far as we can ascertain it, the need for protecting the public, and the objective of rehabilitating Holden into a peaceful member of society, if that is possible. From our examination of the record, we conclude that Holden committed a most serious crime, and that at this time he represents a real danger to society. As to his character, we find from reports in the record that he is highly paranoid and has deep-seated psychological problems that are magnified by his consumption of alcohol.

---

**9.** *Bordewick v. State,* 569 P.2d 184, 186 (Alaska 1977); *Newsom v. State,* 533 P.2d 904, 911 (Alaska 1975); *State v. Chaney,* 477 P.2d 441, 446 (Alaska 1970).

**10.** *Post v. State,* 580 P.2d 304 (Alaska 1978).

**11.** The evidence of a former rape could be considered by the judge in sentencing, despite the fact that Holden was never charged or indicted for the offense. The reason is that evidence of the former rape was verified by the sworn testimony of the victim, and Holden had the opportunity to explain or deny the incident. *Nukapigak v. State,* 562 P.2d 697, 701 (Alaska 1977).

**12.** *State v. Wortham,* 537 P.2d 1117, 1120 (Alaska 1975), *quoting Galaktionoff v. State,* 486 P.2d 919, 924 (Alaska 1971).

As to the objective of rehabilitation, we find it difficult to make any realistic estimates. If he is imprisoned for a sufficient length of time, where alcohol will not be available, it is possible that with proper counselling he can be convinced that he must abstain from alcoholic beverages for the remainder of his life after release from incarceration. He is badly in need of psychiatric and psychological treatment during his incarceration, and later during supervised parole—assuming he is paroled. In fact, it is imperative that he receive such treatment. Whether he can be placed in an institution where he can obtain such treatment, we do not know. It seems doubtful from what knowledge we have of the prison system in Alaska. About all we can do is repeat again, and emphasize, what we have said before:

> We . . . assume that the Division of Corrections and the Parole Board are fully cognizant of these reformative needs and will undertake appropriate measures to bring about appellant's early return to the status of a non-criminal member of our society.[13]

The controlling standard of our review of sentences is whether the trial judge was clearly mistaken in imposing the sentence he did. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974). We cannot say that such a mistake was made in this case. We agree with the sentencing judge that Holden is a worst type of offender.

The judgment is affirmed.

BOOCHEVER and BURKE, JJ., not participating.

SCHULZ, Superior Court Judge, concurring.

I concur in the result reached as to all issues in this appeal, however, I wish to state separately my conclusion that Holden's equal protection and due process claims are devoid of merit.

A.S. 11.15.160 provides:

> "*Assault with Intent to Kill or Commit Rape or Robbery.* A person who assaults another with intent to kill, or to commit rape or robbery upon the person assaulted, is punishable by imprisonment in the penitentiary for not more than 15 years nor less than one year."

It may be, as the majority states, that an attempt to commit rape may occur without an assault, but Holden's conduct in pulling a gun on Jane clearly brings within the scope of A.S. 11.15.160. He has no claim at all that he should have been charged under A.S. 11.05.020.

This case is not just "not an appropriate one for resolution of" the equal protection claim. The claim is frivolous, and I believe we should say so.

---

13. *Bordewick v. State*, 569 P.2d 184, 187 (Alaska 1977); *Waters v. State*, 483 P.2d 199, 202 (Alaska 1971).