Jimmy Lee WALKER, Appellant,

v.

STATE of Alaska, Appellee.

No. 4921.

Supreme Court of Alaska.

Oct. 8, 1982.

George E. Weiss, George E. Weiss and Associates, Anchorage, for appellant.

David Mannheimer, Asst.Atty.Gen., Anchorage, and Avrum M. Gross, Atty.Gen., Juneau, for appellee.

Before RABINOWITZ, C.J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

BURKE, Justice.

Jimmy Lee Walker was tried and convicted by a jury for rape under AS 11.15.120.[1] He was sentenced to five years imprisonment with two years suspended. On appeal, he challenges his conviction on numerous grounds: (a) that the trial court erred in giving certain jury instructions and in failing to give others; (b) that the trial court erred in not declaring a mistrial when the complaining witness fainted after giving her testimony; (c) that the jury was unrepresentative due to the exclusion of military personnel claiming a domicile outside Alaska; (d) that the trial court erred in admitting certain hearsay statements; (e) that the pre-information identification was improper because Walker's attorney was not present; and (f) that multiple errors at his trial had the cumulative effect of denying Walker a fair trial. Walker also contends that the trial court's refusal to grant him a post-conviction bail hearing, because he was ineligible for release under former AS 12.30.040(b), violated his right to equal protection of the laws.

## FACTS

At trial, the state relied on the testimony of the complaining witness, M.M., as well as

---

1. Former AS 11.15.120(a) provided: "A person who (1) has carnal knowledge of another person, forcibly and against the will of the other son, forcibly and against the will of the other person ... is guilty of rape." The new Criminal Code, effective January 1, 1980, recodifies rape in AS 11.41.410–.440.

certain physical evidence. M.M. testified that on the evening of January 5, and the early morning of January 6, 1979, she and a friend were at the Montana Club in downtown Anchorage. As was her custom, M.M. had no alcoholic beverages to drink. As the evening wore on the smoke-filled air of the club began to bother M.M., so she went out the club's back door for some fresh air.

M.M. testified that while she was outside two black men ordered her into a car. Fearing for her safety, M.M. got into the car. The men then drove to an apartment in the Mountain View area of Anchorage.

According to M.M., they eventually arrived at a four-plex apartment building and went into a downstairs apartment. M.M. testified that shortly thereafter several other black men came to the apartment, but soon left at the request of one of the two men that first accosted her. M.M. then stated that one of the two men took her into the bedroom and raped her.

M.M. testified that after the first man left the bedroom, his companion entered. She attempted to leave, but her second assailant pushed her onto the bed, spraining her toe, and threatened to harm her if she did not submit. She testified that he forced her to perform oral sex, then raped her.

According to M.M., her second assailant then told her to shower; instead, when the man left the room, she hid in the closet. Subsequently, she was able to run from the apartment, leaving her clothes behind. M.M. testified that she ran to the upper story of the apartment building and hid in the laundry room, behind a clothes washer. Later, covering herself with a bathmat from the laundry room, she rang the doorbell of a neighboring apartment. The tenant let M.M. in and she informed him she had just been raped by two black men downstairs. The tenant then called the police.

The tenant testified that, while waiting for the police to arrive, he observed a black male leave the apartment building with a bundle in his arms. The black male ran down the street until out of view and returned, empty-handed, within ten to twenty seconds. The tenant's description of the man matched Walker's appearance when arrested, as to length of hair, moustache, and general description of clothing, although the tenant overestimated Walker's height and weight. At trial, the tenant identified Walker as the man he saw that evening.

Arriving shortly after the tenant's call, the police found M.M. in the upstairs apartment covered with only a sheet. After listening to her story and obtaining a description of her assailants, two officers went to the downstairs apartment, while another maintained a watch outside the apartment to ensure that no one left. The tenant later directed one of the arriving officers to the place he had seen the man run to earlier; the officer found M.M.'s clothes there, buried in the snow.

Meanwhile, the other officers found seven occupants in the downstairs apartment, six black males and one Alaska Native female. One of the men was the defendant, Jimmy Lee Walker. Subsequently, when M.M. was escorted to the officer's car, she looked into the downstairs apartment's front window and identified her two assailants. One of the two men she identified was Jimmy Lee Walker.

Walker and the others were taken to the police station and interviewed. Walker denied having seen any woman other than the one present in the apartment when arrested. He also denied having intercourse with anyone during the previous month.

Walker was subsequently tried by jury and found guilty of rape. Walker's request to be freed on bail pending appeal was denied by the trial court and thereafter by this court. Subsequently, Walker sought release by habeas corpus in the United States District Court for the District of Alaska. On May 29, 1980, the District Court ruled that AS 12.30.040(b) denied Walker equal protection of the law and ordered the state to provide a bail hearing pursuant to AS 12.30.040(a) within thirty days. Although Walker obtained a bail hearing, he was not admitted to bail. This appeal followed.

## I.

Walker first contends that the following instruction to the jury constituted reversible error:

The law assumes that every person intends the natural consequences of his voluntary acts. Therefore, the general intent required to be proved as an element of a crime may be inferred from the defendant's voluntary commission of the act forbidden by law.

(Emphasis added.) Walker asserts this is a disfavored *Mann*-type instruction,[2] which impermissibly shifted the burden of proof to Walker on the element of intent.

The instruction closely parallels the one held improper in *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).[3] There, the United States Supreme Court held that when intent is an element of the crime charged, a jury instruction providing that "the law presumes that a person intends the ordinary consequences of his voluntary acts" violates a defendant's right to due process, because it constitutes either a burden-shifting presumption or a conclusive presumption on the element of intent. *Id.* at 523–24, 99 S.Ct. at 2458–2459, 61 L.Ed.2d at 50–51. *Sandstrom* concerned

a prosecution for "deliberate homicide, committed purposely or knowingly." *Id.* at 520, 99 S.Ct. at 2457, 61 L.Ed.2d at 49. Unlike the offense of rape, that homicide offense was a *specific intent* crime. The state was required to prove that the defendant acted purposefully or with knowledge. Thus, it was improper to instruct the jury that the law presumes such specific intent from the mere commission of the prohibited act.

On the other hand, rape is a general intent crime.[4] All that is required for a conviction for a general intent crime is proof of the voluntary commission of the prohibited act. Thus, the state was required to prove only that Walker volitionally had intercourse, forcibly and against M.M.'s will. Former AS 11.15.120(a). Because specific intent is not an element of the offense of rape, *Sandstrom* is not controlling. We hold that giving the above instruction was not error.[5]

Walker further asserts that the trial court erred in not instructing the jury to distrust the state's evidence because it was within the state's power to produce stronger and more satisfactory evidence. Walker admits that such an instruction was not

2. *See Mann v. United States,* 319 F.2d 404, 407 (5th Cir. 1963), *cert. denied,* 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964). We approved the *Mann* holding in *Howard v. State,* 583 P.2d 827, 831–32 (Alaska 1978), and *Menard v. State,* 578 P.2d 966, 968–70 (Alaska 1978). *But see Calantas v. State,* 608 P.2d 34, 35–36 (Alaska 1980).

3. The *Mann* instruction is distinguishable. It reads:

It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. *So unless the contrary appears from the evidence,* the jury may draw the inference that the accused intended all the consequences ... reasonably ... expected to result from any act knowingly done ....

*Menard v. State,* 578 P.2d at 968 (emphasis added). The infirmity of the *Mann* instruction is that the phrase "so unless the contrary appears from the evidence" constitutes a burden-shifting charge carrying the potential to mislead the jury with respect to the requirement that the government prove all elements of an offense, including that of state of mind. The language may be construed to *require* the jury

to find intent, based solely on the defendant's acts, absent countervailing evidence. *Id.* at 969. The instruction in this case did not contain that impermissible phrasing.

4. *United States v. Thornton,* 498 F.2d 749, 751–53, 753 n. 12 (D.C.Cir.1974); *Boyd v. State,* 572 P.2d 276, 279 (Okl.Cr.App.1977); *Gallup v. State,* 559 P.2d 1024, 1027 (Wyo.1977).

5. This result is consistent with our previous interpretations of the similar *Mann* instruction. In *Howard v. State,* 583 P.2d 827 (Alaska 1978), we held the use of the burden-shifting *Mann* instruction improper because that defendant was convicted of grand larceny, a specific intent crime. *Id.* at 832. But in *Menard v. State,* 578 P.2d 966 (Alaska 1978), we noted use of the *Mann* instruction was "largely irrelevant" because the defendant was convicted of merely a general intent crime. *Id.* at 970. *But see Calantas v. State,* 608 P.2d 34, 36 (Alaska 1980) (upholding use of *Mann* instruction when additional jury instructions made clear that jury was merely entitled, rather than compelled, to infer intent from conduct, even when defendant is charged with a specific intent crime).

requested at trial, but urges that we find its omission to be plain error. *See* Alaska R.Crim.P. 30. While the state does have a duty to provide available exculpating evidence, *Frink v. State,* 597 P.2d 154, 165–66 (Alaska 1979), the evidence Walker desired was not readily available.[6] Walker's attorney was able to point out the state's asserted lack of diligence in obtaining evidence in his arguments to the jury. More importantly, however, Walker has not met his heavy burden of demonstrating that the omission of such an instruction raises a substantial and important question, *Garroutte v. State,* 508 P.2d 1190, 1191 (Alaska 1973), or denies a fundamental right, *Hammonds v. State,* 442 P.2d 39, 43 (Alaska 1968), so as to constitute plain error. Alaska R.Crim.P. 47. We have examined Walker's other assertions of error regarding the failure to give certain jury instructions and find them to be without merit.[7]

## II.

■ Walker next argues that the trial court erred in failing to declare a mistrial after the jury observed the complaining witness, M.M., faint in the courtroom aisle after completing her testimony. The trial court is vested with wide discretion in determining whether a mistrial should be granted; its decision will be disturbed only if an abuse of discretion is shown. *Amidon v. State,* 565 P.2d 1248, 1261 (Alaska 1977). After M.M. fainted, the trial judge excused the jury and took testimony both as to what

occurred and whether the jury observed the incident. Immediately thereafter, trial resumed and the court admonished the jury to disregard the incident. When the case was submitted to the jury, the court further instructed them that sympathy toward the victim was not to influence their consideration of the case. On these facts, we are unpersuaded that the trial court abused its discretion in denying Walker's motion for a mistrial.

## III.

■ Although not raised at trial, Walker contends on appeal that the state violated his right to an impartial jury by excluding from the jury pool military personnel claiming domicile outside Alaska. We have previously held that the right to an impartial jury trial, as guaranteed in criminal proceedings by the sixth amendment to the United States Constitution and article 1, section 11, of the Alaska Constitution, embraced the concept of a jury constituting a fair cross-section of the community. *Malvo v. J.C. Penney Co.,* 512 P.2d 575, 579–80 (Alaska 1973). Thus, the method of jury selection cannot purposefully and systematically exclude a "cognizable group" or class of citizens in the community from jury service. *Kimble v. State,* 539 P.2d 73, 79 (Alaska 1975); *Malvo,* 512 P.2d at 579–80.

■ On the record before us, Walker has failed to show that those who are in the

---

6. Walker's complaint is that various scientific tests were not conducted on the prosecution's physical evidence: the semen found on Walker's underpants was not typed, the blood found on the pillow in the bedroom was not analyzed to determine whether it was menstrual blood or blood from wounds, and the spermatozoa obtained from the victim's vagina were not typed. Further, a t-shirt allegedly worn by the assailant was never found.

7. Walker asserts the trial court erred in not giving a mistake of fact instruction regarding a possible belief by Walker of the victim's consent. Walker submitted such an instruction but, by failing to object to its omission, he has waived the issue on appeal. Alaska R.Crim.P. 30. Further, Walker produced no evidence mandating such an instruction. *See Christie v. State,* 580 P.2d 310, 314–15 (Alaska 1978)

(there must be "some evidence" of insanity before the defendant is entitled to an insanity instruction); *Warner v. State,* 508 P.2d 525 (Alaska 1973) (trial court must give an alibi instruction where the facts support the request).

Walker additionally contends that the trial court erred in failing to give his requested instruction No. 105 regarding jury sympathy for the victim. Walker argues that the instruction was necessary because the jury observed the complaining witness faint immediately after completing her testimony. However, the substance of instruction No. 105 was given in jury instruction No. 1 and, further, the trial court orally admonished the jury immediately after the incident to disregard what occurred. We find no error in the trial court's actions.

military, residing in Alaska but claiming a domicile outside the state, represent "a cognizable group of persons constituting a particular economic, social, religious, racial, geographical or political group in the community . . . ." *Green v. State,* 462 P.2d 994, 999 (Alaska 1969). No common thread or "basic similarity in attitudes or ideas or experience[s]" has been shown as giving rise to a bias against Walker as a defendant member of the excluded class. *Hampton v. State,* 569 P.2d 138, 149 (Alaska 1977), *appeal dismissed,* 434 U.S. 1056, 98 S.Ct. 1225, 55 L.Ed.2d 757 (1978).[8] Absent a stronger factual showing and a more specific suggestion of prejudice, we conclude that the asserted exclusion from jury service of military personnel claiming a domicile outside Alaska did not constitute plain error.[9]

### IV.

Walker also asserts as error the trial court's admission of his police interview concerning his activities the night of his arrest. At trial, Walker objected to the admission of the interview transcript only on the basis that it was hearsay. On appeal, he challenges the admission of the transcript on a number of additional grounds. Because Walker's other objections were not made in a timely and specific manner as required by Alaska Rule of Evidence 103(a)(1), we do not consider these additional arguments.

■ Evidence may be excluded as hearsay if it contains a statement made by an out-of-court declarant which is offered to prove the truth of the matter asserted. Alaska Rule of Evidence 801(c). The interview contained exculpatory remarks by

Walker that he had not been involved in the rape of M.M. While the state did not articulate its purpose in presenting the transcript, it is evident that it was not offered for the truth of the matter asserted, that is, Walker's innocence. Unless evidence is offered to prove the truth of the matter asserted, the definition of hearsay is not met.[10] Thus, the hearsay objection made by Walker at trial was properly overruled.

### V.

Walker argues he was subjected to an unduly suggestive and leading identification procedure which violated his due process rights. Walker also argues he was "in custody" when the identification was made, and therefore he had a right to have counsel present at the asserted "lineup."

Walker raised these issues in his pretrial motion to suppress. The court took the matter under advisement and it appears that it was still under advisement at the end of trial. Walker then moved for a judgment of acquittal or a new trial, acknowledging that his earlier motion had been impliedly denied.

#### A. Fairness of the Identification.

The facts surrounding the complaining witness's identification of Walker are in dispute. The central conflict is whether M.M. made the identification spontaneously or at the request of the officer.

At the preliminary hearing, M.M. testified that she was sitting in the patrol car, in front of the apartment where the rape allegedly took place, and that the police requested her to look through the window to see if she could identify her assailants.[11]

---

**8.** Compare the extensive factual showing provided by the defendant in *Alvarado v. State,* 486 P.2d 891, 893–96 (Alaska 1971).

**9.** It appears that the actual class excluded is composed of those who actively do not assume Alaska residency. To the extent that this is true, the case is within the ambit of *Hampton v. State,* 569 P.2d at 149, where we upheld the constitutionality of a method of jury selection which excludes less-than-one-year residents.

**10.** Because we have determined that the transcript contained no hearsay, we do not address Walker's additional contention on appeal that the transcript contained hearsay within hearsay.

**11.** The preliminary hearing was held January 23, seventeen days after the arrest. At that hearing, M.M. testified as follows:

Q. How many people were in—how many people could you see in here?
A. I don't know.

On cross-examination at trial she reiterated this testimony. She also testified at the preliminary hearing that she saw only two black men when she looked through the window; at trial she retracted this statement, insisting there were more men than that in the apartment.

The testimony of the officers, however, indicates the identification was spontaneous. After arriving on the scene and interviewing M.M. in the upstairs apartment, Officers Reeder and Smidt proceeded to apartment no. 4, where the rape allegedly occurred. The two officers found the apartment occupied by six black males and one Alaska Native female. As a safety measure, the officers had the occupants open the curtains, so that the officers outside the apartment could see in. Officer Reeder advised the men of the rape allegation. No one volunteered any information, and Officer Reeder told them they would be taken to the station for an interview. At this time, Officer Reeder read the suspects their *Miranda* rights.

Their departure was delayed while one of the occupants dressed. While waiting, Walker repeatedly asked if he could get a drink from the refrigerator. Officer Reeder finally consented, and Officer Smidt accompanied Walker into the kitchen.

Officer Reeder testified that at this point he received a radio message from Officer Loy, who was outside the apartment building with the victim, M.M. The message was that M.M. had identified one of the five black men in the room as one of her assailants. Officer Smidt heard the radio contact but did not hear the contents.

Officer Reeder asked Loy which of the two men standing next to him had been identified; Loy radioed back that it was the man dressing. Moments later Walker walked back into the living room from the kitchen, and Loy radioed that M.M. had identified him as the other assailant.

The testimony thus shows that the officers inside the apartment were unaware that M.M. was outside scrutinizing the occupants until the first identification was made. The men were not paraded in front of the window one by one, as Walker contends, but were milling about. The entire occurrence was over in about twenty seconds.

Officer Loy testified as to what took place outside the apartment. After M.M. put on her clothes, Officer Loy volunteered to take M.M. to the hospital. He testified that they went to his patrol car, which was parked in front of the building. According to him, as he bent down to unlock the back door, M.M. exclaimed that she saw one of her assailants. Officer Loy turned around and saw that she was pointing at a man visible through the picture window of apartment no. 4. The window was approximately four feet by six feet in dimension. Officer Loy stated the total sight distance was twenty to twenty-five feet.

The men were plainly visible. Officer Loy radioed to Officer Reeder inside that M.M. had identified the man putting on his shirt. Walker then walked into view and M.M. identified him as her second assailant. Immediately thereafter, M.M. was escorted to the hospital. M.M. was excited, but not hysterical, when she made the identification.

Relying on M.M.'s preliminary hearing testimony, Walker argues the identification was solicited by the police. He argues that the identification, under the totality of the

Q. Well, did you see one or did you see more than two or did you see just two or did you just—see just one?
A. Two and the police (indiscernible)—two policemen and the two guys.
. . . .
Q. What did you tell the policemen which directed their attention to that apartment and those people in the apartment?
A. They asked me in the police car—I didn't know they were there but they told me, now, you look on through the window and tell me which one of the guys—(indiscernible).
Q. Uh-huh.
A. So I told them right here, the two of them.
Q. Okay. Now could you tell how many people—but you couldn't tell how many people you could see inside?
A. I couldn't tell how many people. All I see was two guys and two policemen, that's all.

circumstances, was impermissibly leading and suggestive and thus violative of his rights to due process of law.[12] He argues that M.M. was virtually certain, under the circumstances, to point out someone, and that the presence of the police officers could only have led her to believe that someone in the apartment must have been an assailant.

Even if the police asked M.M. to look into the window, the question is the same: Was the identification procedure "so unnecessarily suggestive and conducive to [an] irreparable mistaken identification . . . [as to deny] due process of law?" *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967), *cited in Blue v. State,* 558 P.2d 636, 643 (Alaska 1977). This determination must be made based on the "totality of the circumstances." *Stovall,* 388 U.S. at 302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206. In making this determination, the following factors must be considered:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

*Holden v. State,* 602 P.2d 452, 456 (Alaska 1979) (quoting *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977)). We analyze these factors as follows.

First, M.M. had ample opportunity to view Walker before the identification. She rode with him in the car from downtown to the apartment, she was in the apartment with him for some time, and she was assaulted by him. As in *Holden,* the identifying witness was also the victim. Second, the evidence shows that M.M. was sober throughout the incident. Nothing indicates that she was inattentive. Third, when Officer Reeder arrived on the scene, M.M. described one of her assailants as a black male, who had a dark complexion, fairly bushy hair, a moustache, and who

was wearing black pants, dark boots, and a white shirt. Officer Reeder testified that when arrested Walker was wearing black pants, black boots, a "real light gray shirt with print on it," and had a two- to three-inch "Afro" haircut. Walker also had a moustache. No other suspect matched the description to the extent Walker did. "While the description she gave was fairly general, no one has suggested it was inaccurate." *Holden,* 602 P.2d at 456. Also, M.M.'s identification at the scene was certain and without hesitation or equivocation. M.M. testified that there was "no doubt" in her mind as to the accuracy of her identification when first made. Finally, although the record is unclear as to the exact time lapse between the crime and the identification, it was less than two hours. M.M. testified she was in the upstairs apartment less than an hour after the rape, and was being examined at the hospital approximately forty-five minutes later. As in *Holden,* this factor of reliability favors the state.

The only consideration to weigh against the foregoing factors is the possibility that the police suggested that M.M. attempt an identification. No evidence indicates that the identification was set up to identify Walker. The six occupants of the apartment were not so distinctive in appearance as to conclude that Walker was singled out. Under the totality of the circumstances, the foregoing indicia of reliability are not overborne by any suggestive influence so as to constitute an invalid identification. The testimony relating to the identification was properly admitted.

**B. Right to Counsel.**

Walker also argues he was improperly denied counsel at the identification stage of the investigation. The state first argues that the identification was spontaneous, that is, not a lineup and, therefore, no right to counsel had attached. Alternatively, it argues that the facts of this case are within the "exigent circumstances" exception we articulated in *Blue v. State,* 558 P.2d at 642.

---

12. U.S. Const.amend. XIV; Alaska Const., art. 1, § 7.

In *Blue,* we noted that under federal law there is no right to counsel until after indictment or formal charge. However, we noted that the right to counsel under the Alaska Constitution [13] has been given broader application than the right to counsel provision of the sixth amendment of the United States Constitution:

In balancing the need for prompt investigation against a suspect's right to fair procedures, we hold that a suspect who is in custody is entitled to have counsel present at a pre-indictment lineup unless exigent circumstances exist so that providing counsel would unduly interfere with a prompt and purposeful investigation.

*Id.* (footnotes omitted). Although at the time of the identification Walker was not formally under arrest, he was "in custody in that he was detained and not at liberty to leave." *Id.* at 642 n. 9. Of course, whether Walker had a right to counsel depends on whether the identification was part of a "lineup;" the testimony is in conflict as to who suggested that M.M. attempt an identification. If it was at the suggestion of the police, the identification was equivalent to a lineup and the right to counsel attached; on the other hand, if it was spontaneous, there was no lineup and hence no right to counsel.

Because this case is within the "exigent circumstances" exception recognized in *Blue,* we need not resolve this conflict in testimony.

As in *Blue,* the police in this case were notified immediately after the crime occurred and arrived on the scene shortly thereafter. The victim and suspects were on the scene. M.M.'s memory was fresh. The identification was made at approximately 4:00 a.m. and providing counsel at this time of night would have been extremely difficult. Had an identification not been made, all six of the suspects would have been detained. What we said in *Blue* applies here with equal force:

Under these circumstances, providing counsel could have precluded the state's diligent efforts to obtain an identification while the facts were still fresh in the eyewitness' mind. We cannot find that providing counsel under these circumstances is practical, reasonable or mandated by our constitution.

*Id.* at 642 (footnote omitted).

We conclude that the identification of Walker by M.M. was reliable, and that under these exigent circumstances Walker's right to counsel was not violated.

## VI.

Following his conviction, Walker asked the trial court to admit him to bail pending appeal. The superior court denied his request, upon the ground that former AS 12.30.040(b) [14] prohibited the granting of

---

**13.** Article 1, section 11 of the Alaska Constitution provides in part that "[i]n all criminal prosecutions, the accused shall have the right . . . to have the assistance of counsel for his defense." In *McCracken v. State,* 521 P.2d 499, 501–04 (Alaska 1974), and *Davis v. State,* 499 P.2d 1025, 1031–32 (Alaska 1972), *rev'd on other grounds,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), we held that defendants have a right to counsel at pre-trial lineups. In *Roberts v. State,* 458 P.2d 340, 342–43 (Alaska 1969), we extended the right to counsel to a proceeding where the state took a handwriting exemplar from the accused. In *Kimble v. State,* 539 P.2d 73, 77–79 (Alaska 1975), we ruled that there was no constitutional right to counsel at a pre-trial photographic identification procedure. In all of these cases except *Davis,* which involved a pre-indictment lineup, the pre-trial identification occurred after indictment and after appointment of counsel. The decision in *Davis* was not dependent on the

timing of the lineup, and that issue was not discussed.

**14.** At the time in question, AS 12.30.040 provided:

(a) A person who has been convicted of an offense and is awaiting sentence, or who has filed an appeal shall be treated in accordance with the provisions of AS 12.30.020 unless the court has reason to believe that no one or more conditions of release will reasonably assure the appearance of the person as required or prevent the person from posing a danger to other persons and the community. If that determination is made, the person may be remanded to custody. This section does not affect the right of a person appealing from a judgment of conviction from a district court to the superior court to be released on bail pending appeal under Rule 2(c) of the District Court Rules of Criminal Procedure.

such relief to one convicted of rape.[15] The United States District Court, however, ordered the state to provide a bail hearing, holding that former AS 12.30.040(b) violated Walker's equal protection rights under the fourteenth amendment to the Constitution of the United States.[16] In this appeal, Walker renews his challenge to the constitutionality of former AS 12.35.040(b), again on equal protection grounds.

■ We deem this issue moot, as to Walker, and decline to address it. The statute has twice been amended; in its present form it is substantially different than it was at the time Walker was before the superior court.[17] Thus, we are not persuaded to address the issue in the case at bar.[18]

## VII.

Finally, Walker argues that cumulative errors at trial prejudiced him. As has been shown, however, no prejudicial error occurred at trial. As we interpret Walker's argument, it is essentially that there is insufficient evidence to support the jury verdict of guilty because, Walker argues, there was insufficient evidence to support such a conclusion beyond a reasonable doubt. He stresses in particular certain discrepancies in the complaining witness' testimony.

■ As we stated in *Noble v. State,* 552 P.2d 142, 144 (Alaska 1976): "The determination by the trier of fact of the credibility of witnesses, the weight of the evidence, and the guilt of the defendant will not be upset lightly." For Walker to prevail on a challenge of the sufficiency of the evidence to support his conviction, he must meet the following test:

In determining the issue raised by such challenge, the evidence and the inferences to be drawn therefrom are to be viewed in a light most favorable to the state. The question, then, is whether the finding of guilt is supported by substantial evidence, that is, such relevant evidence which is adequate to support a conclusion by a reasonable mind that there was no reasonable doubt as to appellant's guilt.

*Beck v. State,* 408 P.2d 996, 997 (Alaska 1965) (footnotes omitted). In reviewing the record, we do not find the evidence so improbable or inadequate as to justify overturning Walker's conviction.

(b) Notwithstanding the provisions of (a) of this section, if the offense a person has been convicted of is first degree murder, armed robbery, kidnapping, or rape (as defined in AS 11.15.130), he may not be released on bail either before sentencing or pending appeal.

**15.** Walker's petition to this court for such relief was also denied.

**16.** The district court was careful to note, however, that it's order did not guarantee Walker's release, stating:

This does not mean that Walker is entitled to bail pending appeal. Under AS 12.30.040(a), persons convicted of a crime may still be denied bail if at a judicial hearing it's determined that no conditions of release will assure the person's appearance or protect the public.

In fact, after providing the hearing required by the district court's order, the superior court still refused to admit Walker to bail, apparently concluding that there were no conditions that would assure his future appearance or provide adequate protection for the public. The correctness of that determination is not an issue in this appeal.

**17.** In 1980, AS 12.30.040(b) was amended to deny post conviction bail to persons convicted of "murder in the first degree, robbery in the first degree, kidnapping, or sexual assault in the first degree." Ch. 102, § 36, SLA 1980. In 1982, the section was amended again. It presently denies bail, "either before sentencing or pending appeal," to those persons "convicted of an offense which is an *unclassified felony or a class A felony.*" Ch. 45, § 15, SLA 1982 (emphasis added).

**18.** In *Griffith v. State,* 641 P.2d 228 (Alaska App.1982), the Alaska Court of Appeals declared the 1980 version of AS 12.30.040(b) unconstitutional, *see* note 17, *supra,* upon the ground that it violates the equal protection provisions of the state and federal constitutions. Our opinion today, while leaving the decision in *Griffith* intact, should not be read as an expression of approval of the holding in that case. We express neither approval nor criticism of that decision at this time. We simply decline to address the issue presented in the case at bar, for the reason stated.

It is true that there were inconsistencies in M.M.'s testimony. In her statement to the police after the incident, M.M. stated that the car she rode in was part red. At trial, however, she testified it was green and gray. At trial, she indicated some doubt as to whether Walker was the assailant, but this was because he then wore a beard and not the moustache he had worn earlier.[19] Finally, M.M. was unable to recall many details of the evening.

Viewing these inconsistencies most favorably to the state, *see Noble v. State,* 552 P.2d at 145, we do not find them so persuasive as to mandate reversal of Walker's conviction. There was sufficient physical and testimonial evidence to "support a conclusion by a reasonable mind that there was no reasonable doubt" as to Walker's guilt. *Beck v. State,* 408 P.2d at 997.

For these reasons, Walker's conviction is AFFIRMED.

---

**19.** M.M. stated at trial that Walker had a beard at the time of the rape. M.M.'s native language is Yupick and the testimony indicates that she did not comprehend the distinction between "beard" and "moustache."